UNITED STATES, Appellee

v.

David E. GILLEY, Technical Sergeant
U. S. Air Force, Appellant

No. 00-0559

Crim. App. No. 32877

_____

United States Court of Appeals for the Armed Forces

Argued November 15, 2000

Decided November 15, 2001

BAKER, J., delivered the opinion of the Court, in which GIERKE and
EFFRON, JJ., joined.  CRAWFORD, C.J., filed an opinion concurring in
part and in the result.  SULLIVAN, S.J., filed an opinion concurring
in part and dissenting in part.

Counsel

For Appellant:  Major Jeffrey A. Vires (argued); Lieutenant
   Colonel James R. Wise and Lieutenant Colonel Timothy W. Murphy
   (on brief); Major Stephen P. Kelly and Major Thomas R. Uiselt.

For Appellee:  Lieutenant Colonel Karen L. Manos (argued);
   Colonel Anthony P. Dattilo, Lieutenant Colonel Ronald A.
   Rodgers, and Captain Christa S. Cothrel (on brief); Lieutenant
   Colonel William B. Smith.


Military Judge:  Howard R. Altschwager

THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION

Judge BAKER delivered the opinion of the Court.

On April 22-23, 1997, appellant was tried by a general court-martial consisting of officer and enlisted members. Appellant was charged with nine specifications of committing indecent acts on his three stepchildren and four specifications involving assault and battery of the same children, in violation of Articles 134 and 128, Uniform Code of Military Justice, 10 USC §§ 934 and 928. He was convicted of six specifications of indecent acts and one specification of assault and battery. Appellant was sentenced to a dishonorable discharge, confinement for ten years, total forfeiture of pay and allowances, and reduction to E-1. The convening authority approved the adjudged sentence. The Air Force Court of Criminal Appeals affirmed.

This Court granted review of the following issues:

I.

> WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR
> WHEN, CONTRARY TO MILITARY RULE OF EVIDENCE 301
> (f)(3), HE ADMITTED EVIDENCE THAT WHEN QUESTIONED
> BY INVESTIGATORS, APPELLANT ELECTED TO REQUEST
> COUNSEL AND ALLOWED TRIAL COUNSEL TO REFER TO
> APPELLANT'S REQUEST FOR COUNSEL IN HIS FINDINGS
> ARGUMENT AND FAILED TO PROVIDE A CURATIVE
> INSTRUCTION, THEREBY PERMITTING A VIOLATION OF
> APPELLANT'S RIGHT UNDER THE FIFTH AMENDMENT OF
> THE UNITED STATES CONSTITUTION AND ARTICLE 31 OF
> THE UNIFORM CODE OF MILITARY JUSTICE.

II.

WHETHER APPELLANT WAS DENIED EFFECTIVE ASSISTANCE
OF COUNSEL DURING THE POST-TRIAL PHASE OF HIS
COURT-MARTIAL.

For the reasons cited below, as to Issue I, we hold the military judge did not commit plain error. However, as to Issue II, we hold appellant did not receive effective, post-trial assistance of counsel. As a result, we return this case for further action.

FACTS

Appellant was convicted of committing indecent acts on his three stepchildren (ages ten to fourteen), and committing an assault and battery on a stepdaughter. The evidence showed that appellant convinced the children to let him commit the indecent acts by giving them money and telephone privileges, and letting them spend the night with friends. Appellant and his wife also had two biological children, but neither of these children was involved in the offenses.

The defense theory of the case had several components. First, that the sexual misconduct with his stepchildren never happened. According to appellant, his stepchildren were controlled by their mother and had been coached to lie in order to receive victim assistance money. In those instances where appellant did not deny the conduct at issue, he claimed that he

3

and the children were just playing around and were not engaged in sexual misconduct. Second, regarding the assault and battery, appellant claimed that he was administering fair punishment. Third, appellant attempted to discredit two of the three investigators by implying that they fabricated appellant's oral confessions based on their prior knowledge of the stepchildren's allegations. Appellant claimed the investigators then put those fabrications in a written statement, which appellant refused to sign because it contained fabrications.

## ISSUE I

The allegations arose in Loudoun County, Virginia. On July 30, 1996, Donald Canham, a criminal investigator with the Loudoun County Sheriff's Office, with thirty years of experience, interviewed appellant along with Special Agent (SA) Washington of the Air Force Office of Special Investigations (AFOSI) and Henry Stribling (a Loudoun County Social Services Child Protection case worker). Appellant was advised of his Fifth Amendment rights and elected to cooperate and answer questions. When confronted with the allegations, appellant initially said he had no recollection of the alleged acts. Appellant later admitted to several of the allegations.

Following this interview, Loudoun County authorities released jurisdiction to the Air Force. On August 1, 1996, SA Richardson and SA Washington interviewed appellant at Bolling

4

Air Force Base.  SA Washington did the questioning; SA Richardson primarily took notes.  The interview began between 9:00 and 9:30 a.m.  By the time the interview concluded at approximately 2:30 p.m., appellant admitted to acts involving his stepson's genitals, touching his stepdaughter's breasts, putting his hands down his stepdaughter's pants and touching her genitals, watching a stepdaughter masturbate with a vibrator, and hitting a stepdaughter on the tongue with a spoon.  The agents released appellant to go to lunch at 2:30 p.m.

When he returned at 4:30 p.m., appellant was presented a typed statement that was based on the notes taken by SA Richardson.  According to the investigators' testimony, without reading this statement, appellant refused to sign it, stating that he was seeking legal counsel.

At trial, during his opening statement, trial defense counsel stated:

> You will hear that the Loudoun County Sheriff's Office, as well as members of the AFOSI detachment, interviewed Sergeant Gilley; that they read him his rights on two occasions; and on those occasions, he waived his rights and answered questions and he made statements to those agents.
>
> Now you won't see any sort of evidence as far as videotape or audiotape as to what Sergeant Gilley said.  The investigators will tell you what he said, and you are asked to believe that.  But what you will not see is any sort of written statement. You will hear testimony that a written

> statement was prepared. It was prepared by
> the OSI agents and, when they presented it
> to Sergeant Gilley to sign, Technical
> Sergeant Gilley, he refused because the
> words and acts and deeds in that statement
> were not true. They were false.

The first witness called by the Government was Sheriff's Investigator Canham. In cross-examining him, defense counsel established that appellant was advised of his rights, was cooperative, and that the interview was not taped. Next, the Government called SA Richardson. On cross-examination trial defense counsel established the length of the interview, and that SA Richardson prepared the typewritten statement, followed by this question and answer:

> Q: Okay, and when that statement was presented to Sergeant Gilley, he refused to sign that, is that not true?
>
> A: That's correct, Sir. <u>He said he wished to seek counsel</u>.

(Emphasis added.) Defense counsel did not object or indicate that the witness's statement was non-responsive.

On redirect examination, the trial counsel asked SA Richardson questions that rebutted the notion that the OSI agents had concocted a confession that was not true. Then the following colloquy took place:

> Q: And defense counsel asked you if he asked for counsel at the time before signing the written statement, is that correct?
>
> ADC: Objection, Your Honor, that was not my question.

6

MJ:    Overruled.  The question, counsel?

WIT:   Could you repeat the question?

MJ:    You were making a statement, so now ask a question.

ATC:   Yes, Your Honor.  Prior to the end of the interview when the accused asked for counsel, did he ask for counsel at any time prior to that?

WIT:   No, sir.

(Emphasis added.)  Again, defense counsel did not object to this reference to appellant's request for counsel.

SA Richardson was followed to the stand by SA Washington, who, on direct, talked about the admissions appellant made during the course of the interview.  On direct examination, trial counsel asked no questions about appellant's refusal to sign the draft statement or his request for counsel.  On cross-examination, defense counsel elicited from SA Washington that the reason for the August 1 interview was to obtain a confession from appellant.  Following questions about SA Richardson's preparation of the statement, the following exchange took place:

Q:    And when that statement was given to Sergeant Gilley, he refused to sign it?

A:    Sergeant Gilley didn't look at the statement.  He just requested legal.

(Emphasis added.)  Again, counsel did not object to the witness's response.

7

On redirect examination, the assistant trial counsel revisited the point:

Q:   Agent Washington, you mentioned that, in answer to defense counsel's questions, that when Tech Sergeant Gilley came back from lunch he didn't even read the statement that Agent Richardson had prepared and he immediately asked for counsel.

A:   Yes.

ADC: Objection, Your Honor.

MJ:  Overruled.

(Emphasis added.)

Also on redirect examination, in questioning SA Washington as to whether a rights advisement was provided after the preparation of the statement, the following exchange took place:

Q:   So when the typed document is then given to the accused, is he then read his rights again?

A:   No.

Q:   Why not?

A:   In this -- in Tech Sergeant Gilley's case, we got into the interview room and immediately when we did get into -- got into the room, he turned around and said he wants legal counsel.

Q:   Okay, so that is this particular case.  But in terms of your ordinary procedures, would you read rights again?

A:   If that was in the expanded time as such before we went into it, he may have been, he would be advised, "You are still under rights advisement".

Q:   Okay.  Now I just want to make clear, did the accused read the typed statement?

8

A:    No, sir.

(Emphasis added.)  Defense counsel did not object.

Finally, during his closing argument on findings, trial

counsel argued:

> Then around [2:30 p.m.] they allowed—the accused goes to
> lunch.  So obviously, this is not the spotlight on the
> suspect where they are grilling him.  They let him go to
> lunch and they are under the impression that he is going
> to come back because they discuss writing a statement.  He
> is going to come back and write a statement out or sign a
> statement from the notes that the agents wrote and wrote
> it out in narrative form.  Well, he comes back some two
> hours later.  Remember that, and that is important because
> two hours later what does he have time to do?  He has time
> now to realize, "Gee, I've said all these statements and
> my rights were advised to me."  Members of the court, you
> are allowed to use your common sense.  What are some of
> those rights that are advised?  Anything you say can and
> will be used against you in a court of law.
>
> So he comes back two hours later, doesn't even look at the
> statement.  Despite defense's cross-examination of the
> agent saying, "He didn't sign that statement because
> anything in that statement wasn't true.  You wrote that
> statement, Agent so and so, didn't you?"  "Sir, he never
> even looked at the statement.  He asked for his attorney."
> Remember that Constitutional requirement that we have, if
> someone asks for an attorney?  They couldn't force him to
> sign that statement.  They weren't out to get him.  And we
> will speak about that theory a little later also.
>
> *  *  *
>
> Their [sic] other theme here and theory was that the
> investigators are just lying.  Remember the experience
> that these agents had.  You had Inspector Canham who had
> over thirty years with Child Protective Services.  Do you
> think he has seen a few cases before?  You had Special
> Agent Richardson who works for the DEA.  You had Agent
> Washington who works for the OSI.  These three guys are
> coming in here and lying just to get this guy?  That is
> another thing that the defense wants you to believe here.
> There is a conspiracy to get the accused by the agents.

9

That is putting their credibility in issue here. And specifically, I guess the two main points they harped on was the fact that, on a form that Agent Washington signed, he said he was at an interview when it was just that he was being briefed by it and he signed for receipt of Inspector Canham's notes and briefings and then he went to an interview with him. It is kind of a standard operating procedure. He said, "Yeah, I probably shouldn't have done that, but no, I wasn't there." Even Inspector Canham said he wasn't there at first. He was there, but not in the interviews. He was there, but he did not sit in on the interviews.

If they were to have had a conspiracy, members of the court, go back in your deliberations and think. These three agents, these law enforcement agents who had over sixty years of experience in law enforcement, don't you think they could have come up with more egregious acts than what is charged here? Don't you think we could have had maybe a little penetration or oral sodomy or something like that? If they were really out to get this guy, if they really wanted to lie and make sure it stuck, why not add a few more things? There is no conspiracy here. You have the charges in front of you.

Again, defense counsel did not enter an objection to trial counsel's argument. In his closing argument on findings, defense counsel argued:

The purpose of the second interview was to obtain a confession. And they typed up something for Sergeant Gilley to sign and Sergeant Gilley wouldn't sign it. They say Sergeant Gilley wouldn't read it, he decided to invoke his rights. But your common sense and your knowledge of the ways of the world say that if somebody types something up for you to sign, you read it and if it is not true, you don't sign it. And the investigator said that what they typed was a synopsis of what they testified about. So when they put that in front of Sergeant Gilley, he refused to sign it because it was not true.

In his rebuttal argument on findings, trial counsel again touched on appellant's invocation of his right to counsel:

10

They said in--their argument was the second interview was out to get a confession. If they wanted to get a confession, why let the guy go to lunch for two hours? Why let him go to lunch if you are going to get a confession? Why not just type it up while he is there and have him sign it there and then go to lunch? You saw Agent Washington. This is not the Gestapo. You saw him and he testified and you get to judge his honesty. Why not just keep him there and have him sign a statement? Order him or something like that. They can't because, when he came back, he requested counsel and they can't do anything further after that, members of the court. That is why they didn't get it.

The military judge instructed the members as follows: "The accused has an absolute right to remain silent. You will not draw any inference adverse to the accused from the fact that he did not testify as a witness. The fact that the accused has not testified must be disregarded by you." The military judge did not instruct the members about the right to counsel.

## ISSUE II

Prior to taking action in appellant's case, the convening authority properly afforded appellant the opportunity to submit clemency matters under RCM 1105 and 1106, Manual for Courts-Martial, United States (2000 ed.).[1] The convening authority received twelve matters from defense counsel and appellant. The defense counsel's 1105 petition informed the convening authority that his client had been unjustly convicted, but also asked that

---

[1] All Manual provisions are identical to the ones in effect at the time of appellant's court-martial, unless otherwise indicated. RCM 1105(b) was amended after appellant's court-martial, but the amendment was minor and has no impact on the content of this opinion.

the confinement be reduced to four years and be served at the Charleston brig, where there was a sexual offender treatment program (defense counsel attached a syllabus of that program to his 1105 petition).

The general theme of appellant's clemency package was that appellant was wrongfully convicted and should be granted clemency. Enclosures 3 and 4 went beyond the general theme and included negative comments on the Air Force judicial system, as well as pointed criticisms of specific individuals.

Enclosure 3 was a letter from appellant's mother. In this letter, addressed to the convening authority, she stated that "I can't believe the Air Force has turned on [appellant] when he needs them," and "If you can't see through this, it's unbelievable." Additionally, in commenting on the appropriateness of appellant's sentence, she stated, "You know his life is ruined – which it should be if he was guilty."

Enclosure 4 was a letter from appellant's father. This letter is a vitriolic attack on the Air Force and its judicial system. It reads, in pertinent part, as follows:

> In my opinion David is getting a raw deal. No man like David, that has served his country and so dedicated to his job as an Air Force air controller should have to go through anything like this. . . .

> . . . .The whole damned thing was a kangaroo court. David was guilty before he ever went to court and the military helped it along. They saw a man with a good rank, 18

years of service, never been in trouble, and close to retirement and a way to take it away.  It would save the Government a lot of money and make the Air Force look good.  That was the plan and the Air Force lawyers, the military jury, the judge, the Air Force high ranks wanted it ended in two days.  They wanted David put away so all of them could look good.  All they are [sic] a bunch of low-lifed [sic] bastards as far as I'm concerned.  All they want was to get it over so they could go home.  I overheard the jurors talking in the hallway.  They knew the kids were coached and lying, but wanted it over.  Man, did that make the Air Force look good.  They saved the Federal Government a lot of money.  That's the game plan.  Put David Gilley away for ten years, take his rank and retirement and brand him for life as dishonorable.  It's bad enough to lose your family and be lied about and be branded for life.  But to spend 10 years in prison, lose your career, your personal belongings and never be able to see your two children that belong to you again.  That's what a person gets when you marry a lying tramp whore who wouldn't know a decent person if they kicked her in the ass and give [sic] her a new set of brains, which she doesn't have.

* * *

    In conclusion, there isn't much I can say.  I suppose our efforts to get David's charges appealed or overturned will be ignored by the Air Force as well as the U.S. Government.  I know one thing for sure it has ruined my life forever, as well as David's.  I no longer have respect for the armed forces and the federal government for the way they are treating their people.  The American flag no longer flies on the flagpole in my front yard (I took the pole down) – like it used to.  I no longer care what happens to our nation or our government.  After what the Air Force has done to my son and my family I lost faith in about everything.  Sometimes I think God has turned his back on me.  Tears come to my eyes everyday and night without warning.  Sometimes at night it haunts me with visions of a man dressed in orange coveralls with his hands handcuffed behind his back and his ankles shackled.  That's the price an innocent man pays for serving his country.  I hope you low-lifed [sic] bastards along with that lying no good whore and her bastard kids, that lied about David, enjoy your freedom now, and burn in hell later.  Everytime [sic] something bad happens and you

13

wonder why, then you can sit back and say God forgive me, I'm sorry I was part of a plan to convict an innocent man and make his family suffer for the rest of their life. You will bear the heavy cross of burden and shed the tears like I do.  Everyday for the rest of your life as I will be doing.  No man deserves punishment like this unless he's a killer on death-row.  I think when the military or the government does something like this their [sic] nothing but a chicken-shit bunch that should have to face the firing squad because they don't know what justice is. Those dumb ass Air Force judges, lawyers, and jurors all thrown together wouldn't make one good civilian lawyer. In civilian life they laugh at the dumb asses.  I wish I was a rich man, I'd shove all this up their ass.  As I see it, it's entirely up to you to grant David an appeal or reduce his sentence.  Personally I think he has suffered enough.  If not then maybe you'll enjoy being like me, having flashbacks and shedding tears in the middle of the night and living with it day by day.

The twelfth and final enclosure is a copy of an electronically mailed (e-mail) statement from appellant's brother attacking the Air Force legal system and appellant's defense counsel as incompetent.

No affidavit was submitted by the defense counsel, but appellant in his affidavit stated, "Neither of my trial defense counsels discussed with me the content of my father's clemency letter other than to tell me that there were some curse words in it and that they were asking him to rewrite it.  I did not direct that my father's clemency letter be included in my clemency package."

### DISCUSSION

It is well settled that the Government may not use a defendant's assertion of his Fifth Amendment rights as

14

United States v. Gilley, No. 00-0559/AF

substantive evidence against him.  Griffin v. California, 380

U.S. 609, 614 (1965); see also Baxter v. Palmigiano, 425 U.S.

308, 319 (1976); Lakeside v. Oregon, 435 U.S. 333, 338 (1978);

United States v. Ruiz, 54 MJ 138 (2000).  Violations of the

Griffin rule are subject to harmless error review.  Chapman v.

California, 386 U.S. 18 (1967).

> Mil. R. Evid. 301(f)(3), Manual, supra, provides:
>
> The fact that the accused during official questioning and in exercise of rights under the Fifth Amendment to the Constitution of the United States or Article 31, remained silent, refused to answer a certain question, requested counsel, or requested that the questioning be terminated is inadmissible against the accused.

The Drafters' Analysis of this rule states that it follows

United States Supreme Court decisions.  A22-7, Manual, supra;

see United States v. Hale, 422 U.S. 171 (1975)(An accused's

silence during police interrogation lacked significant probative

value so that any reference to his silence in cross-examination

in an attempt to impeach his alibi carried with it an

intolerably prejudicial impact entitling him to a new trial.);

Doyle v. Ohio, 426 U.S. 610 (1976)(Use for impeachment purposes

of an accused's silence at the time of arrest and after

receiving Miranda warnings violates due process.).

Hale and Doyle addressed government comments on the

accused's right to remain silent.  This case implicates comments

on the accused's right to counsel.  The analysis, however, is

15

parallel to that regarding the right to remain silent; both rights flow from the Fifth Amendment.  See United States v. Daoud, 741 F.2d 478, 480 (1st Cir. 1984)(analysis for comments regarding right to remain silent is the same as for right to counsel); United States v. Kallin, 50 F.3d 689, 693 (9th Cir. 1995)(right to counsel included in Miranda warnings and therefore carries implicit assurance that invocation carries no penalties).

We also recognize the Supreme Court's holding that the Government is permitted to make "a fair response" to claims made by the defense, even when a Fifth Amendment right is at stake. United States v. Robinson, 485 U.S. 25, 32 (1988); see also Doyle, supra at 619-20 n.11 ("It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest.  In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest."); Walder v. United States, 347 U.S. 62, 65 (1954)(The availability of an objection to the affirmative use of improper evidence does not provide the defendant "with a shield against contradiction of his untruths.").  Robinson addresses the prohibition against prosecutorial comment upon the

failure to testify, which is a corollary of the right to remain silent. Accordingly, the analysis in Robinson applies to this case.

The defense counsel in Robinson, in closing, argued several times that the Government did not allow the defendant, who did not testify, to explain his side of the story. "Following this closing and out of the presence of the jury, the prosecution objected to the remarks of defense counsel and contended that the defense had 'opened the door.'" 485 U.S. at 28. The trial judge agreed. In rebuttal, the prosecutor remarked that the defendant "could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain." Id. "Defense counsel did not object to this closing and did not request a cautionary instruction. Nonetheless, the court included in the jury instruction the admonition that 'no inference whatever may be drawn from the election of a defendant not to testify.'" Id. at 28-29.

Robinson held that the prosecutor's statement did not violate the defendant's Fifth Amendment rights, because the prosecutor's reference to the defendant's opportunity to testify "did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was

17

afforded, contrary to the statement of his counsel, to explain his side of the case." Id. at 32. Moreover, Robinson held that where a prosecutor's reference is a "fair response to a claim made by defendant or his counsel," there is no violation of the Fifth Amendment privilege against self-incrimination. Id.

In order to determine whether or not comments are fair, "prosecutorial comment must be examined in context." Id. at 33, citing Lockett v. Ohio, 438 U.S. 586 (1978)(Prosecutor's repeated remarks that the evidence was uncontradicted were not improper because defense counsel focused the jury's attention on silence by outlining the contemplated defense during opening statement and by stating to the court and jury that the defendant would be the "next witness."). Such analysis invokes the "invited response" or "invited reply" rule. United States v. Young, 470 U.S. 1, 11 (1985), citing Lawn v. United States, 355 U.S. 339 (1958). In reviewing whether an appellant was deprived of a fair trial by such comments, the question an appellate court must resolve is whether, "viewed within the context of the entire trial, ... defense counsel's comments 'clearly invited the reply.'" Id., quoting Lawn, supra at 360 n.15.

There are two aspects to the first granted issue, i.e., whether the military judge committed plain error: (1) by admitting evidence that when questioned by investigators,

appellant elected to request counsel, and (2) by allowing trial counsel to refer to appellant's request for counsel in his closing argument and by failing to provide a curative instruction.

> 1. Did the military judge commit plain error by admitting evidence that when questioned by investigators, appellant elected to request counsel?

Appellant's trial strategy, beginning with his defense counsel's opening argument, was to discredit two of the three investigators by implying that they fabricated appellant's oral statements based on their prior knowledge of his stepchildren's allegations. Appellant claimed the investigators then put those fabrications into a written statement, which appellant refused to sign.

Defense counsel initially elicited appellant's request for counsel during his cross-examination of SA Richardson and SA Washington. Consistent with the defense theory of the case, defense counsel asked whether appellant refused to sign the statement. SA Richardson testified that appellant refused to sign the statement and requested counsel. SA Washington testified that appellant "didn't even read the statement" and "immediately asked for counsel."

Faced with an allegation that the Government fabricated important evidence, not surprisingly trial counsel returned to these points of rebuttal on redirect examination. Consistent

19

with the prosecution's theory of the case, trial counsel asked agents Richardson and Washington to recount the close of appellant's interview. Again, they stated that appellant declined to sign the statement without reading it and that appellant requested counsel.

Defense counsel did not object to these responses during cross-examination; however, on redirect, defense counsel objected without specifying the basis for his objection. In the absence of an objection, issues of admissibility of evidence are waived, and we will grant relief only if the admission of such evidence constitutes plain error. United States v. Powell, 49 MJ 460, 462-64 (1998).

Appellant argues that the military judge committed plain error by admitting the testimony of agents Richardson and Washington on cross-examination and redirect. Had the Government first introduced this evidence, this would be a different case. See United States v. Riley, 47 MJ 276 (1997). However, as recounted above, defense counsel opened the door to rebuttal by attacking the veracity of the agents, thus inviting a response from those same agents suggesting an alternative theory as to why appellant refused to sign the statement. Clearly, the agents' testimony that appellant did not read the statement was fair rebuttal. Arguably, reference to appellant's request for counsel also fairly rebutted the defense theory of

the case by offering an alternative explanation as to why appellant did not sign the statement, i.e., appellant wanted a lawyer to review the statement before signing it, whether or not he read it. However, appellant might also have logically requested a lawyer when faced with a false statement, putting his request outside the scope of fair rebuttal. We need not resolve this question. In any event, appellant's request for counsel was not used as substantive evidence of guilt against him. Whether it was error or not to allow the testimony, given the context in which the issue arose here, we are convinced that there was no material prejudice to appellant's substantial rights. See Art. 59(a), UCMJ, 10 USC § 859(a).[2]

> 2. Did the military judge commit plain error by allowing trial counsel to refer to appellant's request for counsel in his findings argument and by failing to provide a curative instruction?

More difficult are the subsequent references to appellant's request for counsel in trial counsel's closing argument, in the absence of appropriate instruction to the members that such information was only relevant to the members' consideration of appellant's claim that the unsigned interview statement was false.

In his closing argument, trial counsel directly referenced appellant's invocation of his rights on three occasions. First,

---

[2] Having found no material prejudice to appellant's substantial rights, we need not address Senior Judge Sullivan's attempt to revisit Powell.

he argued that "[appellant] has time now to realize, 'Gee, I've said all these statements and my rights were advised to me.' Members of the court, you are allowed to use your common sense. What are some of those rights that are advised: Anything you say can and will be used against you in a court of law." Second, he argued, "Remember that Constitutional requirement that we have, if someone asks for an attorney? They couldn't force him to sign that statement. They weren't out to get him." Finally, on rebuttal, he argued that the reason SA Richardson and SA Washington did not order appellant to stay and sign a statement was because appellant "requested counsel and they can't do anything further after that, members of the court. That is why they didn't get it."

By contrast, defense counsel argued, consistent with his theory of the case, that appellant refused to sign the written statement because it was not true. He also referred to trial counsel's argument, stating: "They say Sergeant Gilley wouldn't read it, he decided to invoke his rights." Defense counsel argued that that scenario did not make sense, but that "common sense and your knowledge of the ways of the world say that if somebody types something up for you to sign, you read it and if it is not true, you don't sign it."

In reviewing the actions of the military judge, we must ask whether, given the defense theory of the case, trial

22

counsel's comments were fair. Robinson, 485 U.S. at 32. Here, the defense counsel focused the jury's attention on why appellant refused to sign the written confession, beginning with his opening statement. The defense contention was that appellant read the statement but refused to sign it because it was fabricated by SA Richardson and SA Washington. As we have previously noted, the defense theory could have been contradicted by testimony from the agents that appellant refused to sign it without even reading it. Nonetheless, both agents added to their testimony that at the same time, appellant invoked his right to counsel. Because appellant failed to object to the testimony, and since the testimony contradicted appellant's claim that he read the statement but refused to sign it because it was full of lies, we find that defense counsel opened the door to the use of this testimony for that limited purpose.

Defense counsel's mention of appellant's counsel election during his closing argument was consistent with his theme and consistent with the limited purpose for which we find the door to have been opened. On the other hand, the repeated references to appellant's request for counsel could have reflected negatively upon the invocation of those rights by leading the members to attach a significance to such invocation that went beyond fair rebuttal of appellant's allegation.

Nonetheless, since defense counsel did not object or request a curative instruction, we will grant relief only if the military judge's failure to instruct sua sponte was plain error. See United States v. Southwick, 53 MJ 412, 414 (2000); United States v. Boyd, 55 MJ 217, 222 (2001) ("Because the defense did not request an instruction on the impact of a punitive discharge on temporary disability retirement, we will grant relief only if the military judge's failure to instruct sua sponte was plain error."); Powell, 49 MJ at 464; United States v. Fisher, 21 MJ 327 (CMA 1986).

We noted in United States v. Carpenter, 51 MJ 393, 396 (1999), that this Court, in a variety of contexts, "has commented that it is improper for a prosecutor to ask the court members to infer guilt because an accused has exercised his constitutional rights." In United States v. Toro, 37 MJ 313, 318 (CMA 1993), this Court held that it was improper to comment on the exercise of the right to remain silent. Although closely related, this Court has not specifically ruled on a prosecution argument that an accused invoked his right to counsel.

As we noted in Carpenter, "the lack of defense objection is relevant to a determination of prejudice" because the lack of a defense objection is "'some measure of the minimal impact' of a prosecutor's improper comment." 51 MJ at 397 (citation omitted). In addition to the lack of objection, in this case,

24

the overwhelming evidence of record demonstrated appellant's guilt. Although trial counsel's argument tied appellant's exercise of his right directly to his exculpatory story (that he did not sign the written statement because it was full of lies fabricated by SA Richardson and SA Washington), this exculpatory story was implausible for several reasons. First, it was premised on the collaboration in a falsity by three investigators from two different jurisdictions. The first investigator was a civilian, and only when the case was turned over to the military did SA Richardson and SA Washington become involved. Second, appellant admitted to committing the offenses of which he was convicted, both to the civilian investigator and then later to SA Richardson and SA Washington. Third, the admissions were directly supported by the testimony of appellant's wife and stepchildren.

Although we are troubled by trial counsel's repeated references to appellant invoking his right to counsel without objection and without instruction, based upon the overwhelming evidence of appellant's guilt and the implausibility of appellant's exculpatory story, we hold that there was no material prejudice to appellant's substantial rights in this case.

ISSUE II

Appellant argues that he received ineffective assistance of counsel in the post-trial phase when his defense counsel submitted highly inflammatory letters to the convening authority.  The Government argues that the letters were simply impassioned pleas for corrective action that criticized the prosecutors, not the convening authority, and continued the defense trial strategy by maintaining appellant's children and wife were lying and that he was innocent of the charges.

The Sixth Amendment guarantees the right to effective assistance of counsel.  In the military, this right extends to assistance in the preparation and submission of post-trial matters.  See United States v. Fluellen, 40 MJ 96, 98 (CMA 1994).

We have adopted the Supreme Court's test for effectiveness of counsel articulated in Strickland, as well as the presumption of competence announced in United States v. Cronic, 466 U.S. 648, 658 (1984).  United States v. Grigoruk, 52 MJ 312, 315 (2000), citing United States v. Scott, 24 MJ 186, 188 (CMA 1987).  We have adopted a three-pronged test to determine if the presumption of competence has been overcome:

> (1)  Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

(2) If the allegations are true, did defense counsel's level of advocacy fall "measurably below the performance. . . [ordinarily expected] of fallible lawyers"? and

(3) If a defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result.

Id., quoting United States v. Polk, 32 MJ 150, 153 (CMA 1991).

Responsibility for tactical and strategic post-trial decisions are within the control of counsel. Counsel has the responsibility to "make an evaluative judgment" on what items to submit to the convening authority, and to so advise his client. United States v. MacCulloch, 40 MJ 236, 239 (CMA 1994). As we noted in MacCulloch, "One of the last best chances an appellant has is to argue for clemency by the convening authority." Id.

In this case, counsel submitted twelve items to the convening authority. The letter from appellant's mother arguably undercut appellant's plea for clemency. The letter from appellant's father was acerbic. It was a scathing diatribe directed toward trial counsel, trial defense counsel, the members, the judge, and the convening authority, to whom the letter was addressed. The e-mail statement from appellant's brother echoed the theme of appellant's father's letter.

It is impossible to imagine any possible clemency arising from appellant's father's statement, "I hope you low-lifed bastards along with that lying, no good whore and her bastard kids, that lied about [appellant], enjoy your freedom now, and

burn in hell later."  Likewise, it is impossible to put a positive spin on his father's statements, such as, "I think when the military or the government does something like this their [sic] nothing but a chicken-shit bunch that should have to face the firing squad because they don't know what justice is.  Those dumb ass Air Force judges, lawyers, and jurors all thrown together wouldn't make one good civilian lawyer."  Res ipsa loquitor.

We expect that a convening authority in the exercise of his clemency power will anticipate and deal professionally with the heartfelt disappointment and confusion of a family trying to comprehend the trial, conviction, and sentencing of a son or daughter.  However, letters that go far beyond disappointment and confusion and contain a scathing denouncement of the system and its participants cannot be viewed as helpful to an appellant's request for clemency.  The prejudicial impact of appellant's father's letter was compounded by appellant's brother's letter and his mother's letter.  Appellant's affidavit mentioned only that his defense counsel discussed with appellant the content of his father's letter and that they were asking his father to rewrite it.  We are concerned about the cumulative impact of all three letters, but especially with the content of appellant's father's letter which, even if rewritten, was inappropriate.

28

In this case, appellant was sentenced to a dishonorable discharge, confinement for ten years, and associated penalties. Appellant petitioned the convening authority to disapprove his sentence and allow his administrative discharge. Alternatively, counsel requested reduction in confinement to four years and designation of the Charleston brig as the place of confinement, which would allow appellant to "serve a lengthy prison sentence without imprisonment in the US Disciplinary Barracks at Ft. Leavenworth, KS." Counsel also argued that it would allow appellant access to a superior sex offender program run by the Air Force at the Charleston brig. The convening authority did not grant appellant any clemency. By attaching these letters, trial defense counsel may have dashed appellant's "last best chance" for sentencing relief or for assignment to Charleston for sex offender treatment.

Addressing the three-pronged Polk test to determine competence, we answer all three questions in the affirmative. We find that trial defense counsel in this case failed to make an evaluative judgment on what items to submit to the convening authority. We can find no reasonable explanation for counsel's inclusion of these letters. We also find the inclusion of these letters to fall "measurably below the performance ... [ordinarily expected] of fallible lawyers." Finally, while we cannot know with certainty what relief, if any, the convening

29

authority might have granted, there is a reasonable probability that absent the admission of these letters, there would have been a different result. As in MacCulloch, the submission to the convening authority of the contempuous and abusive letter from appellant's father "effectively negat[ed] any plea for clemency." 40 MJ at 240. Thus, at the very least, removal of these letters would have resulted in a meaningful clemency hearing.

Accordingly, we hold that appellant was denied effective assistance of counsel during the post-trial phase of his court-martial.

### DECISION

The decision of the United States Air Force Court of Criminal Appeals and the convening authority's action are set aside. The record of trial is returned to the Judge Advocate General of the Air Force for submission to an officer exercising general court-martial jurisdiction over appellant for consideration of a new post-trial clemency petition and staff judge advocate's recommendation, and action. Thereafter, the record will be returned to the Court of Criminal Appeals for further review, and then Article 67, UCMJ, 10 USC § 867, shall apply.

United States v. Gilley, No. 00-0559/AF

CRAWFORD, Chief Judge (concurring in part and in the result):

The right to counsel[1] and the right not to incriminate oneself[2] are hallmarks of our adversary system. But a defendant may not use the shield of these constitutional rights to prevent the Government from contradicting the untruths and reasonable inferences that the factfinders could logically draw from the defense cross-examination.[3]

The Government may not introduce as substantive evidence in the first instance that a person invoked his or her right to silence and/or right to counsel.[4] However, these invocations may be used to impeach any witness, including a defendant. Moreover, when the defendant opens the door, the Government may forcefully rebut the evidence and its reasonable inferences.[5] Remaining silent in the face of an accusation or remaining silent by invoking one's right without any explanation at the time is evidence of guilt. There may be reasonable explanations for one's silence -- "The statement is false"; "I don't trust you"; "I want to think about it"; "I want to know what others have said before I make a statement." However, these

---

[1] "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.
[2] "No person shall ... be compelled in any criminal case to be a witness against himself...." Id. at amend. V.
[3] See, e.g., United States v. Havens, 446 U.S. 620 (1980).
[4] See, e.g., Griffin v. California, 380 U.S. 609 (1965).
[5] See Havens, supra.

explanations do not undercut the inference that silence, without explanation, is evidence of guilt.

On cross-examination, defense counsel brought out that appellant invoked his right to counsel because of the untruths in the typewritten statement.  The Government had a right to rebut this assertion, to include arguing its falsity.  For this reason, I do not agree with the rationale of the majority, but concur in the result.

Appellant, like the defendant in United States v. Beason, 220 F.3d 964 (8th Cir. 2000), sought to take advantage of a constitutional right and use it as a sword.  The defense in Beason sought to take advantage of the rule in Bruton v. United States, 391 U.S. 123 (1968).  This rule provides that at a joint trial, co-defendant A's confession, which implicates co-defendant B, is not admissible against B.  In limine instructions would be inadequate because co-defendant B cannot test through cross-examination the evidence set forth in A's confession.

In Beason, the Government introduced evidence that Beason was the kingpin who was selling drugs from his truck while hiding hundreds of thousands of dollars in its inside compartments.  Like most drug kingpins, Beason had some runners. One of these was an individual named Washington.  Defense counsel asked FBI Agent Hempen whether Washington, who had a

prior drug arrest, was the source of the information concerning where the money was hidden in the truck.  The Government argued and the trial judge agreed that this question opened the door for a different agent to testify about other information provided by Washington -- information that revealed the truck's ownership, how the money was collected, how the money was given to Washington, and who was giving directions concerning where to hide it in the truck.  On appeal, the Eighth Circuit reasoned:

> Beason's theory of defense at trial was that Washington orchestrated the events in question, while Beason was an unknowing bystander.  We find defense counsel's questioning, stressing not only that information regarding the hidden currency did not come from Beason, but also that it came from Washington, an individual with a prior drug record, did more than simply dispel an assumption that Beason provided the information.  It could have created a misleading inference to the jury that Washington was the "bad guy."

220 F.3d at 968.

Likewise, in United States v. Havens, 446 U.S. 620 (1980), the Court prohibited the defense from using a constitutional right as a sword in order to prevent the Government from contradicting the defense theory of the case.  The Court recognized that in Walder v. United States, 347 U.S. 62 (1954), Harris v. New York, 401 U.S. 222 (1971), and Oregon v. Hass, 420 U.S. 714 (1975), impeachment with illegally obtained evidence was permitted because of what the defendant said on direct examination. "These cases repudiated the statement in Agnello

[v. United States, 269 U.S. 20 (1925),] that no use at all may be made of illegally obtained evidence." 446 U.S. at 625.

In Havens, the Court of Appeals held that evidence illegaly seized could only be used to impeach if it contradicted a particular statement made by the accused during direct examination. Accordingly, since a T-shirt taken from Havens's luggage was tainted evidence, it could not be used, because Havens was asked nothing during his direct testimony about the T-shirt or luggage. The Court of Appeals also relied on the statement in Agnello that Agnello had done nothing "to justify cross-examination in respect of the evidence claimed to have been obtained by the search." Id.

In reversing, the Supreme Court restricted the reach of Agnello to cases of cross-examination having too tenuous a connection with any subject opened by direct examination to permit impeachment by tainted evidence. Relying on Harris and Hass, the High Court indicated that the objective of the exclusionary rule is served without extending it to legitimate cross-examination needed to satisfy the fundamental, truth-seeking goal of our legal system. Id. at 626.

This is not an instance where there was an inadvertent opening of the door. From the opening statement through final argument and at numerous points in between, the defense set forth their theory of the case: that the statement typed by the

agents who had questioned appellant was false, and when he reviewed that written statement and its falsity, he requested counsel.  Defense counsel's eliciting testimony that appellant invoked a constitutional right was a conscious, intentional act to undermine the law enforcement officers and support the defense theory of the case.  Thus, the Government had the right to rebut all reasonable inferences set forth by the defense.

As to the trial counsel's argument, there was no error. The defense theory of the case was that appellant gave total cooperation until the agents sought to get him to sign a false statement.  The defense evoked this theory numerous times during the trial.  A trial judge is not required to count the number of times the trial counsel responds to the defense theory, and in fact, some of the prosecution's statements as to the theory of the case are paraphrases of what the defense was setting forth throughout the trial.  As the Air Force Court of Military Review once observed:

> A criminal trial is not a tea dance, but an adversary proceeding to arrive at the truth.  Both sides may forcefully urge their positions so long as they are supported by the evidence.  Considering the trial counsel's closing argument in toto, it was within the bounds of fair comment considering the state of the evidence.

United States v. Rodriguez, 28 MJ 1016, 1023 (AFCMR 1989).

For the reasons mentioned above, I concur in the result as to Issue I and concur on Issue II.

SULLIVAN, Judge (concurring in part and dissenting in part):

## Overview

The majority, as part of its plain error analysis on Issue I, has examined the record as a whole and determined that "there was no material prejudice to appellant's substantial rights in this case." ___ MJ at (21, 25). It justifies its conclusion on the basis of the context of this trial, "the overwhelming evidence of appellant's guilt," and "the implausibility of appellant's exculpatory story." Id. at (25). Such a holding is clearly inconsistent with the plain error approach of this Court in United States v. Powell, 49 MJ 460, 464 (1998). See United States v. Ruiz, 54 MJ 138, 144 (2000) (Gierke, J., concurring in part and in the result and dissenting in part) (disagreeing with majority that "unfair prejudicial impact on the jury's deliberation is an element of plain error").

I sense a continued withdrawal, albeit sub silentio, by the majority of this Court from the plain error dicta [1] of United States v. Powell. See United States v. Tanksley, 54 MJ 169, 173

---

[1] United States v. Powell, 49 MJ 460, 465 (1998), particularly addressed the question whether the Court of Criminal Appeals was required to reverse a conviction where it found plain error under United States v. Olano, 507 U.S. 725 (1993). It did not purport to address the proper plain error test for our Court.

(2000); <u>United States v. Ruiz</u>, <u>supra</u> at 138-43; <u>United States v. Kho</u>, 54 MJ 63, 65 (2000); <u>United States v. Southwick</u>, 53 MJ 412, 414 (2000).  I applaud the majority's return to the more conventional outcome-oriented approach to plain error previously followed by this Court in <u>United States v. Fisher</u>, 21 MJ 327, 328 (CMA 1986).  <u>See</u> <u>generally</u> <u>United States v. Wilson</u>, 54 MJ 57, 60-62 (2000) (Sullivan, J., concurring in part and dissenting in part), citing <u>United States v. Olano</u>, 507 U.S. 725 (1993).

Issue I
Trial Counsel's Argument
(Plain Error)

As a preliminary matter, I must note my disagreement with the majority that trial counsel's references in his closing argument to appellant's pretrial request for counsel "reflected negatively" on his right to counsel and, therefore, constituted error.  ___ MJ at (23).  In <u>United States v. Robinson</u>, 485 U.S. 25, 32 (1988), the Supreme Court clearly said: "[W]here as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege."  The references in this case were proper in this light, and there was no suggestion that the prosecution was trying to use this evidence of exercise of rights to substantively show appellant's guilt.  Even if I were to find that these references to appellant's exercise of his right to

counsel were erroneous without specific limiting instructions, I would find such errors neither obvious nor substantial.

Concerning the majority's "material prejudice to substantial rights" analysis, I agree that this factor is appropriate in a military plain error case, i.e., a case where there was no objection at trial to the prosecutor's argument. See generally Article 59(a), UCMJ, 10 USC § 859(a). I also note that under conventional plain error doctrine, there is a requirement for determining whether the unobjected to error affected an accused's substantial rights. See United States v. Wilson, supra (Sullivan, J., concurring in part and dissenting in part). By that is meant, did the "unobjected to" error, as demonstrated by the entire record of trial, substantially impact the outcome of the trial? Id.; see United States v. Kho, supra (Sullivan, J., concurring). Contrary to Powell, supra at 464, this Court has once again implied that in our Court, the effect of the unobjected to error on the outcome of the case as demonstrated by the record of trial is a recognized part of finding plain error. See United States v. Tanksley, 54 MJ at 173; see also United States v. Ruiz, 54 MJ at 143.

Article 59(a), UCMJ, is consistent with this approach. It states:

> A finding or sentence of court-martial may
> not be held incorrect on the ground of an

3

> error of law <u>unless the error materially
> prejudices the substantial rights of the
> accused</u>.

(Emphasis added.)


Similar language has been viewed by the Supreme Court as
"authoriz[ing] no remedy unless the error <u>does</u> 'affec[t]'
substantial rights."  See <u>United States v. Olano</u>, 507 U.S. at
735.  It also has been construed to place the burden on the
convicted person to show prejudice to his trial result based on
the entire record, <u>and not on the Government to show
harmlessness</u>.  <u>Id</u>. at 734.


This Court has applied Article 59(a), UCMJ, somewhat
differently <u>where error has been objected to at trial by the
accused</u>.  If the error is a violation of constitutional or codal
norm, we have required that the Government convince us that
unobjected to error was harmless based on the entire record of
trial.  See <u>United States v. Lucas</u>, 1 USCMA 19, 23, 1 CMR 19, 23
(1951); <u>United States v. Lee</u>, 1 USCMA 212, 216, 2 CMR 118, 122
(1952).  In this regard, we have followed Supreme Court case law
(<u>Kotteakos v. United States</u>, 328 U.S. 750, 761-62, 764-65 (1946))
and Fed. R. Crim. P. 52(a) in applying Article 59(a), UCMJ, to
objected to errors.

United States v. Gilley, 00-0559/AF

Nevertheless, with respect to unobjected to error at the trial level, this Court has literally applied Article 59(a), UCMJ, consistent with Supreme Court decisions on plain error and Fed. R. Crim. P. 52(b).  See generally United States v. Fisher, 21 MJ at 327; United States v. Plaut, 18 USCMA 265, 272, 39 CMR 265, 272 (1969); United States v. Pond, 17 USCMA 219, 224, 38 CMR 17, 22 (1967); United States v. Stephen, 15 USCMA 314, 317-18, 35 CMR 286, 289-90 (1965).  This body of plain error law places the burden on the appellant to show prejudice from the entire record of trial as to the outcome of the case.  See United States v. Williams, 47 MJ 142, 144 (1997); United States v. Hall, 46 MJ 145, 147 (1997); United States v. Czekala, 42 MJ 168, 170-71 (1995); United States v. Pollard, 38 MJ 41, 51 (CMA 1993); United States v. Strachan, 35 MJ 362, 364 (CMA 1992); see generally United States v. Olano, 507 U.S. at 732; Johnson v. United States, 520 U.S. 461, 467 (1997).  This Court's "burden shifting" pronouncements in Powell, 49 MJ at 460, temporarily upset this body of law but they are no longer controlling.  See United States v. Tanksley, 54 MJ at 173.

In sum, the plain error approach of United States v. Powell, supra at 465, which required the appellant to merely show the type of legal right violated and then the Government to show harmlessness based on the entire record of trial, has been rejected by the Supreme Court.  United States v. Young, 470 U.S.

5

1, 16-17 n.14 (1985).  It has said that courts have "studiously avoided" this approach and commentators have "properly criticized" it.  Such an approach has also been rejected by all the circuits and called "strange" by a noted legal commentator. See 3A Charles Alan Wright, Federal Practice and Procedure § 856 at 344 n.26 (2d ed. 1982 & 2001 Supp.).  The majority of this Court today also rejects this approach, albeit sub silentio, and returns to our traditional and well-established position of following Supreme Court precedent on this matter.  It has reembraced United States v. Fisher, supra (___ MJ at (24)), and required, as part of its plain error analysis, that the entire record of trial be examined to determine whether the outcome of the trial was impacted.

Issue II
Ineffective Assistance of Counsel
(Prejudice)

On the ineffective assistance of counsel question, however, I disagree.  In my view, there was no reasonable probability in appellant's case that a different result would have obtained if defense counsel had winnowed the letters of his father, mother, and brother from appellant's clemency package.  See United States v. Grigoruk, 52 MJ 312, 315 (2000).  Contrary to his pleas, appellant was found guilty of numerous sexual offenses and a physical abuse offense over a three-year period with his stepson and his two stepdaughters, who were from ages ten to fourteen at the time of trial.  After his conviction, appellant continued to

assert his stepchildren were lying at the behest of his wife, even though there was some evidence in this case of a pretrial confession.  No remorse was shown.  Accordingly, even if the inappropriate letters from appellant's family castigating the Air Force for such a verdict were excepted, appellant's position would not have been enhanced before the convening authority.

Unlike the majority, I agree with and adopt the lower court's common sense view of the family letters.  The Court of Criminal Appeals found:

> After reviewing his mother's letter, we find it to be appropriate for submission to the convening authority.  Neither the tone nor the content is prejudicial or inflammatory.  It is simply a mother's plea that her son is innocent.  The interpretation the appellant asks us to attach to this letter is not reasonable.
>
> The letter from his father contains emotion and anger but it is consistent with the defense theory at trial that the appellant's wife coached the children to lie.  This anger is directed at his son's wife, Air Force lawyers, and the military judge.  According to him, his son was the target for Air Force "high ranks" so they could look good.  His anger builds throughout the letter and he eventually refers to everyone involved in his son's case as "low-lifed bastards" and hopes they "burn in hell."  He bestows his greatest contempt on Air Force lawyers who he views as "dumb asses."  After describing how he has lost faith in the United States, experiences nightmares, and is constantly upset, the appellant's

7

father closes by telling the convening authority,

> As I see it, it's entirely up to you to grant David an appeal or reduce his sentence. Personally, I think he has suffered enough. If not then maybe you'll enjoy being like me, having flashbacks and shedding tears in the middle of the night and living with it day by day.

The appellant's affidavit is silent about whether he directed his attorneys not to include the letter.

Reduced to its basic essence, this letter is from a loving and frustrated father who is convinced of his son's innocence. This is apparent to anyone who reads the words and is a standard plea from relatives and friends. However, the character of this letter is different because rather than begging for mercy, he leaves the sugar in the bowl. His contempt for those he sees as his son's tormenters is obvious. His admonition to the convening authority is similar to Marley's exhortation to Scrooge, save yourself (by righting the wrong the system has visited upon my son), or suffer my fate. [1] Even if we were to conclude that counsel violated the first prong of Strickland by submitting the letter, which we do not, the appellant has not demonstrated he suffered any prejudice. An argument can be made that by virtue of his position, the convening authority is one of the "high ranks" excoriated in the letter. However, in our view, the appellant's father excluded the convening authority from his cast of villains because he appealed to the convening authority for justice. We are convinced that any convening authority reading this letter would recognize it was written by a devastated parent who felt powerless to help his child. We refuse to hold that there is no room for candor in the clemency process.

United States v. Gilley, 00-0559/AF

_____

1/ Charles Dickens, A Christmas Carol (1843).

Unpub. op. at 8-9.

As the Supreme Court said in Strickland v. Washington, 466 U.S. 668, 686 (1984):

> The benchmark for judging any claim of ineffectiveness must be whether counsel's counsel so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

I cannot say that the submission of the father's letter in the clemency process breached this high threshold for a successful claim of ineffectiveness of counsel. I, like the U.S. Air Force Court of Criminal Appeals, find that the prejudice prong of Strickland has not been met. Accordingly, I would affirm.

9