# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 38961**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Joshua J. TREBON**
Major (O-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 14 July 2017

————————————

*Military Judge:* Lyndell M. Powell.

*Approved sentence:* Dismissal and confinement for 7 years. Sentence adjudged 23 September 2015 by GCM convened at Joint Base Elmendorf-Richardson, Alaska.

*For Appellant:* Major Annie W. Morgan, USAF.

*For Appellee:* Major G. Matt Osborn, USAF; Major Mary Ellen Payne, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, JOHNSON, and SPERANZA, *Appellate Military Judges*.

Judge SPERANZA delivered the opinion of the court, in which Senior Judges MAYBERRY and JOHNSON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

SPERANZA, Judge:

A military judge sitting as a general court-martial found Appellant guilty, consistent with his pleas pursuant to a pretrial agreement, of willfully disobeying a superior commissioned officer's order to have no contact with Air-

man First Class (A1C) CV; violating a lawful general regulation by engaging in sexual relations with and dating A1C CV; sexually assaulting Senior Airman (SrA) JC by causing SrA JC's penis to penetrate Appellant's mouth without SrA JC's consent; committing abusive sexual contact by touching SrA JC's neck, chest, and abdomen with Appellant's mouth and hand with an intent to gratify Appellant's sexual desire and without SrA JC's consent; making false official statements to investigators; wrongfully and dishonorably accusing SrA JC of sexual assault, which under the circumstances constituted conduct unbecoming an officer and gentleman; and fraternizing with SrA CS, in violation of Articles 90, 92, 120, 107, 133, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 890, 892, 920, 907, 933, 934. The military judge sentenced Appellant to a dismissal and confinement for seven years. Consistent with the terms of the pretrial agreement, the convening authority approved the adjudged sentence.

On appeal, Appellant raises the following errors pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (1) the conditions of his post-trial confinement rendered his sentence inappropriately severe, entitling him to sentence relief; (2) his guilty plea to fraternization was improvident; (3) he was selectively prosecuted; (4) he was denied equal access to witnesses and evidence; (5) he was denied effective assistance of counsel; (6) he was subjected to pretrial punishment; (7) he is entitled to a new pretrial hearing; and (8) his sentence is inappropriately severe. We disagree with Appellant's assertions, find no prejudicial error, and affirm. We address Appellant's claims related to his post-trial confinement conditions, his guilty plea to fraternization, the effectiveness of his counsel, and the severity of his sentence. We have considered and reject Appellant's remaining issues, which neither require additional analysis nor warrant relief. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

## I. BACKGROUND

Appellant, an accomplished officer selected for command, was married with children. Appellant was also involved in a months-long sexual, dating relationship with A1C CV. In addition to dating and engaging in sexual acts with A1C CV, Appellant befriended SrA CS, with whom he socialized, drank alcohol, and went on a three-day camping trip.

SrA CS was also friends with SrA JC. SrA CS invited SrA JC to a gathering hosted by Appellant. SrA JC interacted with Appellant on approximately two or three more occasions after being invited to do so by SrA CS.

Appellant was scheduled to leave Alaska in late November 2014 to take command of a squadron in Texas. Appellant planned his "going away" party accordingly and invited numerous people from the base. The "going away"

party consisted of being driven to and drinking alcohol at several bars. Appellant, A1C CV, SrA JC, and SrA CS were among those remaining at the party's last stop. SrA JC was visibly, heavily intoxicated by this point and the group left the bar after being there for just over an hour. SrA JC's and SrA CS's plans to stay the night at a master sergeant's house fell through when the master sergeant left the party early and went to sleep. The group's designated driver refused to drive SrA JC and SrA CS to SrA CS's house due to hazardous weather conditions. Appellant invited SrA JC and SrA CS to stay the night with him and A1C CV at his house.

Appellant's house was essentially empty at this time; his family and furniture had already departed for Texas. So, SrA JC, SrA CS, A1C CV, and Appellant lay on Appellant's living room floor to go to sleep. SrA JC and SrA CS immediately fell asleep. While SrA JC was sleeping, Appellant lifted SrA JC's sweatshirt over SrA JC's face and kissed SrA JC's neck, chest, and abdomen. Appellant then unfastened SrA JC's pants, pulled down SrA JC's pants, placed his mouth on SrA JC's scrotum and penis, and inserted SrA JC's penis into his mouth. SrA JC eventually realized what was happening, pulled his shirt down, and exclaimed, "What the f[**]k." Appellant responded by rolling away from SrA JC. SrA JC rearranged his clothing and fell back asleep.

The next morning, Appellant drove SrA JC and SrA CS to their cars. SrA JC and SrA CS ate breakfast together. During the meal, SrA JC told SrA CS that Appellant had assaulted him the night before. SrA JC later reported the assault to the installation sexual assault response coordinator (SARC). SrA JC also consented to a sexual assault nurse examination (SANE) that revealed injuries on his penis. The examination included the collection of deoxyribonucleic acid (DNA) samples from SrA JC's lower abdomen, chest, neck, penis, and scrotum. Subsequent analysis revealed the presence of Appellant's DNA on SrA JC's abdomen, chest, neck, penis, and scrotum.[1]

SrA JC and SrA CS stopped communicating with Appellant. Worried, Appellant sent SrA CS text messages inquiring as to why they ceased communications with him. Appellant discussed the "going away" party incident with A1C CV. Appellant sent A1C CV a text message stating that he "sexually assaulted a guy" and another text message declaring "Drunk n horny and 3 some with my bf…lay off."

Within days of the sexual assault, Air Force Office of Special Investigations (AFOSI) agents interviewed Appellant. Appellant lied about what occurred at his house the evening of the "going away" party. After the inter-

---

[1] A1C CV's DNA was also found on SrA JC's lower abdomen, chest, and scrotum.

view, Appellant lodged his own complaint with the SARC, asserting that he was the victim of a sexual assault that evening.

Appellant's wing commander ordered Appellant to have no contact with SrA JC, SrA CS, and A1C CV. However, Appellant willfully disobeyed the order by talking to A1C CV and not reporting this contact to his chain of command.

Less than two weeks after receiving and violating the no-contact order, Appellant completed a written statement in which he falsely accused SrA JC of sexually assaulting him. Appellant caused this false statement and accusation to be provided to AFOSI.

## II. DISCUSSION

### A. Post-trial Confinement Conditions

After trial, Appellant was confined at the Naval Consolidated Brig–Miramar (Miramar Brig) near San Diego, California. While serving confinement at Miramar Brig, Appellant was segregated with the Male Special Quarters (MSQ) for just over 200 days until he was transferred to the Midwest Joint Regional Correctional Facility at Fort Leavenworth, Kansas in October 2016. Accordingly, his access to certain privileges and services was limited or denied. Appellant filed timely complaints with proper authorities concerning the restrictions placed upon him.

In general, Appellant complains that his "post-trial confinement conditions were unnecessarily harsh, without necessity or justification, and in violation of Article 58, UCMJ, 10 U.S.C. § 858." Specifically, Appellant contends that he "was kept in segregated confinement conditions, without proper justification." He, therefore, reasons:

> Given there was no rational basis or justification for holding Appellant in segregation for 203 days, this Court should provide the Appellant with meaningful relief, not only to rectify the injustice that was done in this case, but also to incentivize the government to ensure that military members are confined in acceptable conditions.

Citing to Article 66(c), UCMJ, 10 U.S.C. § 866(c), and *United States v. Gay*, 74 M.J. 736, 740-42 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), Appellant asks us to "approve only so much of [his] sentence as calls for five years confinement and a discharge [sic]."

This court "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article

66(c), UCMJ, 10 U.S.C. § 866(c). In *Gay*, this court invoked Article 66(c) to grant the appellant sentencing relief even in the absence of cruel or unusual punishment in violation of the Eighth Amendment, U.S. CONST. amend. VIII, and Article 55, UCMJ, 10 U.S.C. § 855. *Gay*, 74 M.J. at 742. The Court of Appeals for the Armed Forces (CAAF) held that this court did not abuse its discretion in doing so. *Gay*, 75 M.J. at 269. However, the CAAF noted that *Gay* involved unique facts driven by legal errors in the post-trial process that included both a violation of the appellant's rights under Article 12, UCMJ, 10 U.S.C. § 812, and the ordering of solitary confinement by an Air Force official where an alternative solution was available. *Id.* Significantly, the CAAF emphasized, "In reaching this conclusion, we do not recognize unlimited authority of the Courts of Criminal Appeals to grant sentence appropriateness relief for any conditions of post-trial confinement of which they disapprove." *Id.*

Only in very rare circumstances do we anticipate exercising our Article 66(c) authority to grant sentence relief based upon conditions of post-trial confinement when there is no violation of the Eighth Amendment or Article 55, UCMJ. *United States v. Milner*, No. ACM S32338, 2017 CCA LEXIS 84, at *13 (A.F. Ct. Crim. App. 7 Feb. 2017) (unpub. op.); *United States v. Garcia*, No. ACM 38814, 2016 CCA LEXIS 490, at *14 (A.F. Ct. Crim. App. 16 Aug. 2016) (unpub. op.); *cf. United States v. Nerad*, 69 M.J. 138, 145–47 (C.A.A.F. 2010) (holding that despite our significant discretion in reviewing the appropriateness of a sentence, this court may not engage in acts of clemency). This case does not present such circumstances.

Indeed, Appellant was placed in segregation and formally raised concerns about the restrictions he faced while segregated in MSQ. However, as explained by the Commanding Officer of the Miramar Brig, there was both a rational basis and justification for holding Appellant in segregation for 203 days.

In March 2016, another prisoner accused Appellant of abusive sexual contact, requiring an investigation in accordance with the Prison Rape Elimination Action (PREA). PREA standards required Appellant to be separated from the alleged victim during the investigation. Thus, Appellant was segregated and placed on Administrative Segregation Pending Investigation/Disciplinary Action (ASPID) status. ASPID standards restricted or limited Appellant's access to certain privileges and services.

The investigation uncovered three other prisoners who claimed to have witnessed or experienced "sexual harassment" by Appellant. Appellant was ordered to have no contact with these other prisoners. Consequently, movement de-confliction between Appellant and the prisoners involved in the investigation proved difficult; authorities considered these difficulties when evaluating Appellant's segregation. Appellant's status was periodically re-

viewed in accordance with standard procedure. In conducting such a review, authorities considered "changes in [Appellant's] program plan[,] the safety of his victim and witnesses[,] and maintaining the good order and discipline of the facility."

The commanding officer at the time "founded" the PREA allegation against Appellant and forwarded the case to the applicable Air Force convening authority for potential disposition. The convening authority decided not to pursue court-martial proceedings against Appellant and returned the case to the Miramar Brig for "final adjudication." Appellant received a Disciplinary Report for the "inappropriate sexual touching charge, for which he was found guilty[.]" Appellant was "awarded 30 days Full Loss of Privileges and 20 days Loss of Good Conduct Time." Moreover, "[t]he significant time [Appellant] had spent in [segregation] was taken into account and he was awarded a lenient punishment for [the] level of offense." The PREA findings resulted in specific treatment requirements for Appellant. However, because the prisoner victim and witnesses were either attending, or scheduled to attend, the same treatment, the facility could not "manage [Appellant] away from his victim and witnesses who [were] part of those treatment groups or [would] be." Accordingly, the decision was made to transfer Appellant to Leavenworth in order to avoid "compromising both [Appellant's] treatment as well as the effectiveness of his victim's treatment."

The conditions Appellant complains of—contrary to his assertions—were rationally and reasonably imposed to serve a legitimate purpose: the investigation and adjudication of additional allegations of sexual misconduct committed against another prisoner. Moreover, these conditions ensured the integrity of the investigation and the safety of a victim and witnesses, as well as preserved good order and discipline within the confinement facility. We decline to exercise our extraordinary Article 66(c) power to grant sentence relief under such circumstances.

**B. Guilty Plea (Fraternization)**

Prior to trial, Appellant stipulated to the following facts:

> [Appellant] met SrA [CS] while both were assigned to [the same squadron]. [Appellant] and SrA [CS] became friends based on common interests such as hunting and fishing. SrA [CS] joined the accused for social events in Eagle River, Alaska, including steak night on Friday nights at the Veterans of Foreign Wars (VFW) bar. Eventually, on Friday nights, SrA [CS] and [Appellant] would drink alcohol at the VFW, drink alcohol at Tips bar, and then drink alcohol at the Homestead Bar. They called this the "Eagle River Circuit." SrA [CS] also had dinner

at [Appellant's] house on a handful of occasions. On one occasion, [Appellant] and SrA [CS] traveled to Prince William Sound, Alaska, for a bear-hunting trip. Although other individuals were invited, nobody else was able to go. The trip lasted two to three days. [Appellant] and SrA [CS] borrowed a small boat from a friend and anchored in Prince William Sound to hunt. They drank alcohol and slept in the same cabin in separate beds on the boat. No sexual activity took place between [Appellant] and SrA [CS].

[Appellant] was a commissioned officer and knew that SrA [CS] was an enlisted airman. [Appellant] admits that such fraternization violates the custom of the Air Force that officers shall not fraternize with enlisted members on terms of military equality. [Appellant] admits his conduct was to the prejudice of good order and discipline.

Appellant pleaded guilty to the following:

knowingly fraterniz[ing] with [SrA CS], an enlisted person, on terms of military equality, to wit: consuming alcoholic beverages together while socializing at off-base bars, socializing at each other's homes, and camping alone together for multiple days, in violation of the custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality, such conduct being to the prejudice of good order and discipline in the armed forces.

In conducting his providence inquiry with Appellant, the military judge advised Appellant that by pleading guilty to this offense Appellant was admitting that the following elements were true and accurately described what Appellant did:

First element, is that [during the charged timeframe], you were a commissioned officer in the United States Air Force.

Second element, is that within the state of Alaska, on divers occasions, [during the charged timeframe] you fraternized on terms of military equality with [SrA CS], an enlisted person, by consuming alcoholic beverages together while socializing at off-base bars, socializing at each other's homes, and camping alone together for multiple days.

The third element is that you then knew [SrA CS] to be an enlisted member.

The fourth element is that such fraternization violated the custom of the Air Force that officers shall not fraternize with enlisted members on terms of military equality.

And the fifth element is that, under the circumstances, your conduct was to the prejudice of good order and discipline in the armed forces.

The military judge defined "conduct prejudicial to good order and discipline" as "conduct which causes a reasonably direct and obvious injury to good order and discipline." The military judge further explained to Appellant:

Not all contact or association between officers and enlisted persons is an offense. Whether the contact or association in question is an offense depends on the surrounding circumstances. Factors that should be considered include whether the conduct has compromised the chain of command, resulted in the appearance of partiality, or otherwise undermined good order, discipline, authority, or morale. The facts and circumstances must be such as to lead a reasonable person, experienced in the problems of military leadership, to conclude that good order and discipline in the armed forces have been prejudiced by the tendency of your conduct to compromise the respect of enlisted persons for the professionalism, integrity, and obligations of an officer.

Appellant affirmed that he understood the elements and definitions and confirmed he had no questions about any of them. Appellant admitted that the elements accurately described what he did. Appellant believed and admitted that the elements and definitions taken together correctly described what he did. Nevertheless, Appellant now argues that "[t]here was no evidence admitted that others were aware of the relationship[,]" thus, "[t]he military judge failed to conduct sufficient inquiry into the element of conduct being prejudicial to good order and discipline." Appellant consequently contends that we should set aside this fraternization conviction because "[t]he record is absent of evidence showing Appellant's conduct relating to SrA CS had a direct and palpable injury on good order and discipline in [the] armed forces."

In addition to the stipulation of fact, the military judge relied upon his inquiry with Appellant to determine whether an adequate factual basis for Appellant's plea to this charge existed. During the inquiry, Appellant explained he "had a relationship with [SrA CS] where I allowed that relationship to go down to military equality between the two of us, on a more than familiar basis allowed by the standards of the Air Force."

Appellant first described his relationship with SrA CS as a "mentor relationship" centered on "[c]ommon interests, hunting, fishing, kind of took him under my wing." Accordingly, Appellant "[t]ook [SrA CS] hunting and fishing on quite a few occasions." However, Appellant claimed this relationship "crossed the line [when] we started socializing at bars. More hunting trips, etc., with one individual." Appellant further explained that he invited SrA CS to social events and that his conduct "[e]quated down to equality," and he "started treating [SrA CS] as a peer."

Appellant's explanation led to the following exchanges with the military judge:

> MJ: Okay. Was that because you were, did you consider him a friend, essentially?
>
> ACC: Our relationship developed into being friends, sir, yes.
>
> MJ: Now when you were socializing, if you and [SrA CS] were alone together, was there still kind of that military relationship between the two of you or did that kind of dissolve a little bit and become more of him calling you Josh or anything like that?
>
> ACC: There was occasion sir when he did use my first name.
>
> MJ: And did you correct him or did you allow that to occur?
>
> ACC: Sometimes but not always.
>
> . . . .
>
> MJ: Okay. And, again, when you engaged with him on those occasions was it kind of, was it Major to Airman or was it more Josh to [C]?
>
> ACC: It was more buddies, sir.
>
> MJ: Did you guys engage in the same things that normal friends talk about, conversations and just friendly----
>
> ACC: Yes, sir. We had a lot of common interests.

The military judge and Appellant next discussed the three-day bear hunting trip Appellant took with SrA CS. Appellant maintained that the two enjoyed the trip as "[e]qual hunting buddies, sir. Surviving out in the wild."

Appellant clarified his belief that he fraternized with SrA CS on terms of military equality by stating, "When you start allowing somebody to use your first name, sir, you're giving them an equal position with you. You just threw out a custom and courtesy that keeps a separation between the two of you." Appellant also explained that his conduct was detrimental to good order and discipline because "[i]t could show preferential treatment to the unit. It could

be assumed preferential treatment to the unit." Appellant asserted that "at the time [he had] a lot of pull amongst a lot of organizations on this base" and others members of SrA CS's unit "would probably think he was getting a benefit, the gift of having an officer for a friend."

Appellant later acknowledged that other military members, to include SrA CS's enlisted roommates, knew Appellant, an officer, was friends with SrA CS and such knowledge could have impacted good order and discipline.

At the end of his inquiry with Appellant on this offense, the military judge asked, "Do counsel for either side that any additional inquiry is required?" Trial defense counsel responded, "No, Your Honor."

We review a military judge's decision to accept a guilty plea for an abuse of discretion. *United States v. Blouin*, 74 M.J. 247, 251 (C.A.A.F. 2015). "The test for an abuse of discretion in accepting a guilty plea is whether the record shows a substantial basis in law or fact for questioning the plea." *United States v. Moon*, 73 M.J. 382, 386 (C.A.A.F. 2014) (citing *United States v. Passut*, 73 M.J. 27, 29 (C.A.A.F. 2014)). The military judge must question the accused under oath about the offenses to ensure there is an adequate factual basis for a guilty plea. Rule for Courts-Martial 910(e); *see* Article 45(a), UCMJ, 10 U.S.C. § 845(a). "It is an abuse of discretion for the military judge to accept a guilty plea without an adequate factual basis . . . ." *United States v. Weeks*, 71 M.J. 44, 46 (C.A.A.F. 2012).

Having examined the entire record, we find no substantial basis to question Appellant's guilty plea. *See United States v. Jordan*, 57 M.J. 236, 239 (C.A.A.F. 2002). Appellant was convinced of and able to describe the facts necessary to establish his guilt of the offense, as charged. *See United States v. Murphy*, 74 M.J. 302, 308 (C.A.A.F. 2015). Appellant—an O-4 assigned to the installation's Inspector General's office and formerly assigned to the same unit as SrA CS—held a personal friendship with his "equal," E-4 hunting buddy, SrA CS. The friendship between "Josh" (Appellant) and C (SrA CS) was known to other military members. This relationship, under the facts established within the record, was prejudicial to good order and discipline. Thus, the military judge did not abuse his discretion in accepting Appellant's guilty plea to fraternization.

## C. Effectiveness of Counsel

Appellant pleaded guilty pursuant to a pretrial agreement he freely entered into with the convening authority. In exchange for Appellant's guilty plea to certain offenses, *inter alia*, the convening authority agreed to withdraw and dismiss with prejudice the Additional Charge and its four specifications alleging Appellant committed various sexual offenses against A1C CV.

The convening authority also agreed to disapprove any confinement in excess of seven years.

Appellant signed the offer for pretrial agreement, affirming that he was "satisfied with [his] defense counsel" and "consider[ed] them competent to represent [him] in this court-martial." Appellant further affirmed that his defense counsel fully advised him of "the nature of the charges against [him], the possibility of . . . defending against them, any defense which might apply, and the effect of the guilty plea." Appellant asserted that he "fully underst[ood]" his trial defense counsel's advice.

In accepting Appellant's pleas, the military judge explained each element of each offense to which Appellant pleaded guilty along with the definitions pertinent to each offense. In each instance, Appellant agreed that he understood the elements of each offense and did not have any questions about any of them. Moreover, Appellant agreed that his plea of guilty admitted that the elements accurately described what he did. Appellant also stated that he believed and admitted that the elements and definitions taken together correctly described what he did. After discussing each offense and the factual bases for his pleas with Appellant, the military judge addressed the terms of the pretrial agreement with Appellant.

The military judge found that Appellant fully understood the pretrial agreement and again received affirmative responses from Appellant that he had enough time to discuss his case with counsel, did in fact consult with counsel and receive the full benefit of their advice, was satisfied that his counsel's advice was in his best interest, and was satisfied with his defense counsel. Furthermore, Appellant stated he was pleading guilty voluntarily and of his own free will, no one had made any threat or tried to force him to plead guilty, he had no questions as to the meaning or effect of his guilty plea, he fully understood the meaning and effect of his guilty plea, that he understood that even if he believed he was guilty he had the legal and moral right to plead not guilty and to place upon the government the burden of proving his guilt beyond a reasonable doubt and still wanted to plead guilty to the charges and specifications. His defense counsel similarly informed the court that he had enough time and opportunity to discuss the case with Appellant.

The military judge found Appellant guilty, consistent with his pleas, and the Additional Charge and its specifications were dismissed with prejudice.

Prior to deliberating on an appropriate sentence, the military judge discussed Appellant's post-trial and appellate rights. Appellant's trial defense counsel affirmed that Appellant was advised orally and in writing of his post-trial and appellate rights.[2] In turn, Appellant confirmed that he was advised of these rights, including his right to submit specific matters for the convening authority's consideration prior to action. Appellant had no questions about his post-trial and appellate rights.

After trial, Appellant was personally provided a memorandum from the base legal office with the subject "Submission of Matters to the Convening Authority—United States v. Maj Joshua J. Trebon." This memorandum advised Appellant of his right to submit matters for the convening authority's consideration prior to initial action[3] and to consult with his defense counsel to determine whether to submit such matters.

Appellant acknowledged the time and date he received this memorandum. In addition, Appellant certified that he "consulted with [his] defense counsel concerning [his] right to submit matters for the convening authority's consideration before the convening authority takes action in [his] case." Appellant indicated that he did not waive this right and intended to submit such matters to the convening authority.

---

[2] Appellate Exhibit VII is the written advice provided to Appellant by his defense counsel, which included Appellant's affirmation that his defense counsel "satisfactorily answered any and all questions [Appellant] had about [his] post-trial and appellate rights."

[3] The memorandum specifically advised Appellant that these matters may include:

> a. Allegations of errors affecting the legality of the findings or sentence in your case.
>
> b. Portions or summaries of your [Record of Trial (ROT)], or copies of evidence introduced at trial.
>
> c. Matters in mitigation that were not available for consideration at your trial.
>
> d. Clemency recommendations by any court member, the military judge, or any other person.
>
> e. Any other matter you or your counsel believe the convening authority should be aware of before taking action in your case, whether or not available or introduced into evidence at you trial.

Appellant requested, and the convening authority granted, deferral of automatic forfeitures until action. Later, Appellant acknowledged receipt of the staff judge advocate recommendation (SJAR). Consistent with his indorsement of the memorandum, Appellant submitted matters for the convening authority's consideration. Appellant's submission included his request for "leniency and consideration, and grant [sic] any and all forms of clemency you deem appropriate under the given circumstances in accordance with the UCMJ, impact to the victim [SrA JC], the strains on my family, and the true and dedicated officer I once was and still feel I can be again." Appellant supported his request with various character statements. Appellant asserted no legal errors at the time.

Now, on appeal, Appellant maintains that "[h]ad [his] defense counsel advised him of the matters addressed in [his several declarations], Appellant would not have accepted a pre-trial [sic] agreement and would have litigated the allegations against him." Appellant lodges a variety of complaints through several declarations, including claims that his trial defense counsel did not advise him on the outcome of the second preliminary hearing into A1C CV's allegations; they failed to advise about the defense of mistake of fact; they failed to advise him about the elements of the offenses to which he pleaded guilty; they failed to advise him about his rights under Article 13, UCMJ, 10 U.S.C. § 813; they failed to properly advise him of his rights to clemency; and they "coerced [him] into making an uninformed [pretrial agreement] decision."

We ordered and received declarations from Appellant's trial defense counsel in response to his claims. Trial defense counsel's declarations addressed the specific allegations raised by Appellant in his declarations.

The Sixth Amendment guarantees Appellant the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)).

Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). When Appellant "attacks the trial strategy or tactics of the defense counsel, [he] must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'" *Id.* (quoting *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006)). We review allegations of ineffective assistance of counsel de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza,* 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Gooch*, 69 M.J. at 362 (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The record in Appellant's case and the declarations of trial defense counsel refute Appellant's ineffective assistance of counsel allegations.[4] Trial defense counsel's explanations and actions in this case were reasonable, and their level of advocacy well within the performance ordinarily expected of fallible lawyers. Accordingly, we find trial defense counsel competently represented Appellant. Appellant's counsel were presumed to be competent and Appellant failed to overcome that presumption.[5]

## D. Sentence Severity

After being convicted of the offenses to which he pleaded guilty, Appellant faced a maximum sentence of a dismissal, 57 years of confinement, and forfeiture of all pay and allowances. The military judge sentenced Appellant to a dismissal and seven years of confinement. In exchange for Appellant's agreement to plead guilty to certain offenses, *inter alia*, the convening authority agreed to approve no confinement in excess of seven years. Accordingly, the convening authority approved the adjudged sentence.

---

[4] Having applied the principles announced in *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997), and considered the entire record of Appellant's trial, a guilty plea during which he expressed his satisfaction with trial defense counsel, we find we can resolve the issues raised by Appellant without additional fact-finding.

[5] In addition to the specific claims identified in this opinion, we considered all other ineffective assistance of counsel claims raised by Appellant in his declarations and briefs pursuant to *Grostefon*, 12 M.J. 431. We reject those remaining claims as they require no additional analysis nor warrant relief. *See Matias*, 25 M.J. at 363.

Now, Appellant seeks sentence relief, positing that "[d]espite the fact that [his] sentence is the result of a pretrial agreement, the confinement that [he] has received as a result of his sentence is disproportionate to the charged offenses." Appellant asks us to "focus on the career accomplishments for which [he] has been recognized." He maintains that his "unjustly severe" sentence "should be reduced to represent the actual crime [sic] committed in relation to the evidence in extenuation and mitigation presented."

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009). Although we are accorded great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *Nerad*, 69 M.J. at 146.

We have given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial. We disagree with Appellant and find that his sentence of a dismissal and seven years of confinement *does* "represent the actual crime[s] in relation to the evidence in extenuation and mitigation." Appellant admitted to committing the "actual crimes" of sexual assault, abusive sexual contact, making false official statements to investigators, conduct unbecoming an officer for falsely accusing an Airman of sexually assaulting him, disobeying an order, violating a regulation, and fraternization. Appellant's sentence was not inappropriately severe based on the facts and circumstances of his case.

### III. CONCLUSION

The findings of guilt and the sentence are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.[6]

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court

---

[6] Appellant noted that the Court-Martial Order (CMO) erroneously identifies the Additional Charge as violating "Article 12." This appears to be merely a typographical error and Appellant claimed no prejudice as a result of this error; however, we direct promulgation of a corrected CMO to remedy this mistake.