# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39707**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Laurent A. LAGUITAN**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 13 April 2021

————————————

*Military Judge:* Shaun S. Speranza (arraignment); W. Shane Cohen.

*Approved sentence:* Dishonorable discharge, confinement for 8 months, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 1 February 2019 by GCM convened at Joint Base McGuire-Dix-Lakehurst, New Jersey.

*For Appellant:* Major M. Dedra Campbell, USAF; Mr. William E. Cassara, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Dayle P. Percle, USAF; Major Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before LEWIS, D. JOHNSON, and CADOTTE, *Appellate Military Judges*.

Judge D. JOHNSON delivered the opinion of the court, in which Senior Judge LEWIS and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

D. JOHNSON, Judge:

A general court-martial comprised of a military judge sitting alone convicted Appellant, contrary to his pleas, of one specification of sexual assault of JB[1] by digitally penetrating her vulva and causing bodily harm in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for eight months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises three issues on appeal: (1) whether the evidence is legally and factually sufficient to support the conviction; (2) whether defense counsel's failure to call an expert witness in this case and fully cross-examine a key witness denied Appellant the effective assistance of counsel; and (3) whether the court-martial order (CMO) and report of result of trial (RRT) contain errors warranting correction. We also considered whether Appellant is entitled to relief due to presumptively unreasonable post-trial delay. With respect to issue (3), we agree with Appellant that the CMO warrants correction because the CMO has the incorrect date the sentence was adjudged, and we order a new CMO.[3]

We find no prejudicial error and affirm the findings and sentence.

## I. BACKGROUND

### A. Trial Testimony[4]

On 9 December 2016, Appellant and JB were on the same aircraft mission to Germany. There were seven members of the crew on the mission. Appellant

---

[1] At the time of the offense, JB was a female enlisted member of the Air Force. At the time of trial she was no longer a member of the Air Force.

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] We agree with Appellant that the report of result of trial (RRT) erroneously includes the language "with an intent to abuse, humiliate, harass, and degrade [JB]" in the specification even though that language was struck prior to arraignment. However, we decline to order correction of the RRT. Any prejudice Appellant could claim from the incorrect RRT is rectified by the court-martial order which states the correct language of the specification after it was amended.

[4] The facts in this section are drawn primarily from JB's testimony at trial and the testimony of other witnesses.

was serving as the flying crew chief (FCC) and JB was serving as a loadmaster. Since this was JB's first overseas mission, in line with tradition, she was told to carry a stuffed bull mascot and not to lose it. It was also considered tradition for the new crew member to drink alcohol after their first overseas mission.

JB first met Appellant on this mission. She had never seen or spoken with him previously, and she did not speak with him during the flight. After flying through the night, the crew landed in Germany at around seven o'clock in the morning local time. After landing, the crew, including Appellant and JB, went to a store on base to buy alcohol and snacks. At the time, JB was 19 years old, and the drinking age in Germany was 18. While at the store, Appellant told JB that he was "going to get [her] so drunk that [she] could not walk" and that "you never say no to chief."[5] JB purchased two bottles of water, and Appellant purchased wine, Coca-Cola, and a bottle of Jack Daniels. Senior Airman (SrA) TP,[6] a male loadmaster from the crew, purchased beer. At that point the crew traveled to their hotel located off the installation. Once they arrived at the hotel, Appellant gave JB a beer to drink while they were waiting to get their rooms. JB took a sip of the beer and then just held it because she did not like it.

Some members of the crew, including JB, then went to Appellant's hotel room to socialize and drink alcohol. Appellant gave JB a glass of "Jack and Coke" in a wine glass that was three-quarters full and told her to "drink the whole thing." After finishing the first drink, Appellant offered her a second drink. The members of the crew also took shots of "Jack." In total JB testified she had at least three mixed drinks and three shots.

After a few drinks, JB, Appellant, and SrA TP, took a taxi to get food. SrA TP sat in the backseat with JB. JB testified that she was "extremely drunk" because "everything was spinning," and she could not "keep her balance." However, SrA TP testified that JB was acting tipsy but was walking fine when they exited the taxi. After purchasing food the group returned to the hotel to eat.

Upon returning to the hotel, SrA TP went to his room and Appellant and JB returned to Appellant's room. After arriving in Appellant's room, Appellant told JB to make herself comfortable so she removed her boots and sat at the head of Appellant's bed resting against the headboard. The bed was two beds pushed together to form a larger bed. Appellant then poured JB another glass of alcohol, but JB drank less than a quarter of it because she was feeling sick. Appellant was also drinking alcohol as they continued talking. SrA TP re-

---

[5] Flying crew chiefs, like Appellant, are sometimes referred to as "chief."

[6] At the time of trial SrA TP was no longer in the military.

turned to Appellant's room and sat in a chair. JB could not recall where Appellant was seated but remembered he frequently went to the room's balcony to smoke.

At some point JB said she felt cold, so Appellant offered her a blanket. JB stated she took the blanket and lay down on the bed because she was "feeling very tired and very sick, so [she] just la[y] down to try and erase everything." Appellant and SrA TP continued talking after JB lay down. JB next remembered hearing Appellant tell SrA TP "watch this," and Appellant sat down on the bed and began scratching JB's back. At that time JB was lying on her right shoulder. As she was falling asleep, JB heard Appellant tell SrA TP that "[i]t works with all the girls." JB then fell asleep in Appellant's bed. JB woke up a "few times" as she was not in a very deep sleep. Each time she awoke, she looked around, and Appellant would start scratching her back again. SrA TP testified at trial that Appellant touched JB on the neck kind of like a "tickle," but he did not know how to describe it.

JB then fell asleep on Appellant's bed because she felt like she was "okay in that room and [she] thought [they] were all staying in there and [she] did not think [she] was going to end up staying asleep in there." After JB fell asleep, SrA TP testified that he and Appellant discussed whether Appellant should wake JB up, take her room key and sleep in her room, or just let her sleep. They decided to leave her there, and SrA TP witnessed Appellant put a "barrier" of pillows between JB and himself.

When JB awoke, SrA TP was gone, the lights were off in the room, and Appellant was on the bed with JB with pillows placed in between them. Appellant told JB that he placed the pillows there to act as a barrier "so nothing would happen." Appellant then offered to remove the pillows. JB told him that she had "no preference" on whether or not he removed the pillows. Appellant repeatedly asked JB if she wanted the pillows removed "and would not let [her] go back to sleep." Eventually, she told Appellant she was "fine with them being gone."

After Appellant removed the pillows, JB tried to go back to sleep. Appellant then told JB that if it would make her more comfortable, she could remove her bra from under her shirt and her pants. JB removed her bra from under her t-shirt but did not remove her pants. Appellant repeated several times that JB could take her pants off, but JB "kept saying no."

Appellant then asked if JB wanted to cuddle, and she responded "that was fine." At that point JB was feeling "extremely tired." After JB agreed to cud-

dling, Appellant recorded two conversations with JB using his cellular telephone.[7] JB recalled Appellant telling her "I'm going to record you giving consent," to which she responded "okay." JB thought she was giving consent to cuddling. Both audio recordings were admitted as a prosecution exhibit at trial.[8]

> [Appellant:] What did you say?
>
> [JB:] I won't report you.
>
> [Appellant:] Louder.
>
> JB: I won't report you.
>
> [Appellant:] Why?
>
> [JB:] Because.
>
> [Appellant:] Because why?
>
> [JB:] Because you're not doing anything.
>
> [Appellant:] Okay. What if something happens?
>
> [JB:] Then whatever.[9]
>
> [Appellant:] Whatever? No reporting?
>
> [JB:] No.
>
> [Appellant:] Why?
>
> [JB:] Because.
>
> [Appellant:] You want it?

---

[7] Appellant used the video record feature on his phone to make the recordings but no video was discernable. The record uses both terms video and audio recordings. For simplicity in this opinion we use the term audio recordings.

[8] Civilian defense counsel played the admitted prosecution exhibit during findings argument so both recordings are transcribed in the record of trial. Additionally, Defense Exhibit H, a transcript of these recordings, was admitted into evidence. In this opinion we will use the wording from the trial transcript for simplicity. However, we considered all the admitted evidence to determine what JB and Appellant stated in the recordings.

[9] During cross-examination, JB was asked about this statement. Trial defense counsel asked, "So you've already been kissing and you're already cuddling. If something else happens, that certainly had to be beyond kissing and cuddling right?" JB responded, "No."

[JB:] Uh-huh.[10]

[Appellant:] Okay. Would you consider that as, uhhh… uhhh… self-consulting?

[JB:] Yeah.[11]

[Appellant:] You're drunk as s[**]t though. We shouldn't.

[JB:] (Unintelligible).

[Appellant]: Huh? All right. Go to your side of the bed.

[JB:] (Unintelligible).

[Appellant:] Go to your side of the bed. No, no, no. I'm pushing you away. Go to your side of the bed. Why don't you want to?

[JB:] Cause you're comfy.

[Appellant:] So you want to be right here?

[JB:] Yeah.

[Appellant:] Why?

[JB:] I'm comfy.

[Appellant:] Okay.

A second audio recording, taken eight minutes later, captured the following exchange between JB and Appellant:

[JB:] I, [JB], am okay with this and I want this to happen.[12,13]

[Appellant:] Okay. Are you sure?

[JB:] Yes.

---

[10] JB testified at trial that she was referring to cuddling when she made this statement.

[11] JB testified that she was giving her consent to what had happened so far, cuddling.

[12] Appellant's brother, SrA KL, testified at trial as a defense witness that he reviewed the recordings on Appellant's phone the night before he testified. He clarified the video recording that included the language "I, [JB]" was the second video. We note SrA KL's testimony on this matter because other places in the record of trial indicate the recordings occurred in the opposite order.

[13] JB was asked about this statement at trial. Trial defense counsel asked her, "[W]e have established now that you're okay with cuddling, but now [Appellant] is saying if something else happens you're okay with that. Isn't that something else the touching of your genitalia?" to which JB responded, "No."

[Appellant:] Okay. In that case we're gonna – you're just going to be right here and cuddling?

[JB:] Yeah.

[Appellant:] If something else happened, are you okay with that?

[JB:] Yeah.

[Appellant:] Are you sure?

[JB:] Yeah.

[Appellant:] But you're drunk.

[JB:] Yeah.

[Appellant:] So she [sic] shouldn't do it.

[JB:] Uh-huh.

[Appellant:] You should go back to your side of the bed. No?

[JB:] (Unintelligible.)

[Appellant]: Huh?

[JB:] (Unintelligible.)

[Appellant:] You want to be right here?

[JB:] (Unintelligible) I'm comfy here.

[Appellant:] Okay.

According to JB, either prior to, or after, the second recording, Appellant asked JB if she wanted to kiss him and JB replied "sure." JB testified she was "not sure" if they had kissed prior to the second recording but she was certain the second recording occurred before Appellant sucked her breasts which is described below. JB and Appellant were lying on the bed facing each other, and JB leaned over to kiss Appellant. She did not kiss Appellant "very long" and did not kiss him "many times." JB testified that she consented to kissing Appellant.

After they kissed, Appellant then asked JB if she would rub his leg so she grasped "the lower end" of his thigh and massaged it. JB thought Appellant was wearing shorts but she did not remember whether she was "massaging over clothes" or "massaging on skin." Appellant told JB that she could go up higher if she wanted, and she told him she did not want to go any higher. When Appellant continued to suggest she touch him higher, JB stopped massaging his leg. JB testified that at no point did she touch Appellant's genitals.

After JB stopped massaging his leg, Appellant grabbed JB's right arm and pulled her on top of him so that JB was straddling Appellant's legs and hips.

JB indicated she "just sat there" because she did not think they were "doing anything" and she was "okay" with straddling Appellant. As Appellant talked to JB, she tried to get off him at least two times, but each time he would grab her arm to keep JB on top of him. JB did not remember what Appellant was saying at this time.

Subsequent to JB's failed attempt to get off Appellant, Appellant told her that "he would let [her] go" if she gave him a hug. JB testified she was "okay" with giving Appellant a hug. However, as JB leaned toward Appellant to give him a hug, the loose v-neck t-shirt she was wearing "came off of [her] chest," and Appellant put his hands behind her back, pulling her down and holding her as he started "sucking on [her] breasts." In response to a question by the military judge, JB explained that "it was a looser shirt and the v-neck came down kind of low, so like [she] d[id]n't know exactly how he did it, but . . . he kind of like put his chin or something in the shirt to like pull it." JB testified that as soon as Appellant put his mouth on her breasts, she began to push against the bed and headboard in an effort to push herself off of Appellant. JB said she never verbally stated "no" because she so "shocked" she "didn't even know what to say." JB testified she did not consent to Appellant placing his mouth on her breasts.

During this time period JB stated Appellant received a phone call. On direct examination, JB did not recall if it was before or after Appellant placed his mouth on her breasts, but she remembered she was still straddling Appellant.[14] Appellant told JB to answer the phone, telling JB that it was his friend. After answering the phone, the person calling asked who she was. JB responded with her name. The caller asked where Appellant was and she said "right here" and then gave Appellant his phone. JB testified she answered the phone "willingly," did not ask the caller for help, or indicate that she had just been assaulted.

DC, a friend of Appellant, testified at trial that he was the one on the phone calling Appellant when a "female" answered the phone. At that time, DC was stationed in Germany with the United States Army.[15] DC testified that he and Appellant grew up together and that Appellant was "like a brother." DC said Appellant had called or texted to let him know that he was staying at an off-base hotel. DC then called Appellant to see what they were going to do that

---

[14] During cross-examination, trial defense counsel asked JB, "So you have now been assaulted, he puts his mouth on your breasts, and you're on top of him and he gets a phone call?" JB responded, "Yes, sir." JB also agreed with the military judge that the most likely "scenario" is Appellant's mouth on her breasts occurred prior to or concurrent with the phone call.

[15] At the time of trial, DC was no longer in the Army.

night. DC testified he "vaguely" remembered that a female answered the phone. DC indicated he told Appellant he was on his way to the hotel which was approximately 25 minutes from his house.

Either during or after this phone call, JB rolled off Appellant and laid on her back facing the ceiling. After Appellant hung up the phone, he leaned over JB and placed his right arm behind her neck and covered her mouth with his hand pressing so hard that she could not "move [her] head very much." Appellant then stuck his left hand down her pants, under her underwear, and rubbed around her clitoris. Appellant was telling her to "be quiet and to hush, and just stay quiet." On direct examination, JB testified "he stuck his fingers in [her] vagina." Later in direct examination, JB again described Appellant rubbing around her clitoris but then testified Appellant "stuck his finger in her vagina after a second." JB knew it was his finger because "there was nothing else in his hand that would've been able to do that" and she "just felt his finger go into [her] vagina." JB testified it was not in her vagina very long, and she did not think it was Appellant's whole finger. JB indicated that Appellant penetrated her "vaginal lips." JB could not remember if her pants were fully zipped and buttoned.

After Appellant put his hand in her pants, JB grabbed Appellant's arm with both hands and tried to pull his hand out of her pants. Appellant had his hand in JB's pants for "about a minute" and he had his finger inside of her for "[m]aybe a few seconds." JB testified she was scared, had no idea why it was happening, and was trying to get out of the situation. At one point, trial counsel asked JB if "at any point on 10 December 2016, did [she] consent to [Appellant] sticking his finger into [her] vagina?" to which JB responded, "No."

After Appellant removed his hand from JB's pants, and uncovered her mouth, JB rolled off the bed and tried to gather her belongings, put on her bra, and leave. As JB was trying to put on her boots, Appellant took them and threw them across the room so she could not put them on. At some point Appellant threw JB back on the bed and began tickling her. JB told Appellant to stop, and he did while stating he was "just messing with [her]."

JB then put her boots on, collected her belongings, including the stuffed bull mascot and began to leave. Appellant offered to walk JB back to her room, but she declined. However, Appellant insisted and exited the room with JB. At that point Appellant was on the phone again, but JB did not recall when Appellant received the call. When Appellant and JB arrived outside JB's room, Appellant grabbed the stuffed bull and ran back downstairs to his room and closed his door. JB followed Appellant and knocked on his door in an effort to

retrieve the stuffed bull.[16] Appellant opened his door while he was still on the phone. JB saw the stuffed bull on Appellant's nightstand so she entered his room, grabbed it, and attempted to leave. Appellant then stopped JB and told her if she gave him a kiss she would let her leave. JB gave Appellant a "quick kiss" and left.

At some point after JB left Appellant's room, Appellant and DC met at Appellant's hotel so they could go out. DC testified that at the hotel Appellant told DC that the female on the phone was just a "friend, a coworker" and that "[t]hey made out, he fingered her." DC took that to mean that Appellant had inserted his finger into her vagina. DC also testified that because of the way Appellant described the incident "it seemed like everything was all consensual, . . . two single people getting together."

After leaving Appellant, JB returned to her room. Once in her room, JB texted SrA BB who was a loadmaster in the same squadron as JB. JB testified that at the time her relationship with SrA BB was more than a friendship. JB and SrA BB spent a significant amount of time with each other, expressed feelings of love for each other, and were "sleeping together."[17] JB told SrA BB in the texts, "One of the crew got me really drunk and then wouldn't let me leave his room even though I kept saying no." JB never stated Appellant's name in the texts but used the term "FCC." JB asked SrA BB if he was "mad" or "upset" with her. After SrA BB questioned why he would be, JB responded "[b]ecause the whole time I was just thinking that if you knew how I screwed up you'd be mad." She then explained to SrA BB that she should not have drank so much, should not have gotten on the bed, should have left when she realized she was falling asleep, and should have made him stop touching her back to make her relax and fall asleep. JB also told SrA BB she should have been "smarter" about everything.[18]

SrA BB testified as a witness for the Defense and recalled that in December of 2016, he and JB "were friends and were sleeping together" and were "definitely close" but were "not dating." After receiving JB's text he "contacted the

---

[16] The military judge asked JB to "[h]elp [him] understand why [retrieving] a bull [mascot], in [her] mind at that time . . . was more important than possibly being sexually assaulted again?" JB explained that "if [she] didn't have the bull and then all the crew would ask questions, and [she] would have to answer and tell them what had happened, and at that point [she] wasn't . . . comfortable with telling people what happened yet."

[17] At the time of trial, JB and SrA BB were married.

[18] The texts between JB and SrA BB were admitted into evidence.

First Sergeant and told him something was wrong with [JB]." SrA BB stated he was not sure what had happened, but that he "just knew something wasn't right." SrA BB testified that he has never asked JB what happened to her in the room that night. When asked by trial counsel his definition of "dating" he explained, "Dating to me would be letting people know you're together and just exclusively seeing each other, just fully invested in each other, no one else." After SrA BB notified the First Sergeant of his communications with JB, the acting First Sergeant reached out to JB.[19] JB told her in general terms that Appellant had sexually assaulted her.

DC testified that after he met Appellant they went out along with a friend of DC's. He stated they went to a "bar/dining establishment." DC testified he thought they went there because Appellant's crew was already there. Only one female was in attendance, and DC asked Appellant if that "was the one he made out with," and Appellant responded "yes." Similarly, Appellant told the Air Force Office of Special Investigations (AFOSI) that he saw JB at dinner that night. However, JB testified that she met the crew for dinner at the restaurant attached to the hotel and Appellant was not there; he texted or messaged the crew that he was going out with friends instead of going to dinner with the crew.

SrA TP testified that the next morning Appellant told SrA TP that he and JB had kissed but "that is the only thing."

After JB's chain of command became aware of the assault, Appellant was sent home from Germany. JB's report to the chain of command led to an AFOSI investigation of Appellant's conduct with JB. Upon returning from Germany, Appellant reported to the Sexual Assault Response Coordinator that JB had sexually assaulted him by grabbing his genitals.

**B. Appellant's AFOSI Interview**

On 21 February 2017, AFOSI agents interviewed Appellant. Because Appellant had made a complaint against JB and she against him, Appellant's interview was both as a subject and victim. During trial, the video recording of the interview was admitted into evidence and transcribed into the record.

Appellant initially told AFOSI agents that when JB fell asleep in his bed, he and SrA TP discussed what they should do with her and decided to place a barricade of pillows in the middle of the bed so that JB remained on her side. SrA TP subsequently left, and at some point JB woke up and tried moving closer to Appellant. Appellant asked JB what she was doing and she responded that she just wanted "to be closer to [him]." At that point JB became more

---

[19] The First Sergeant and Acting First Sergeant are two different individuals.

"touchy," and JB began playing with Appellant's hair. Appellant told her to stop. She then "tried to grab [his] chest." Then JB grabbed his genitals over his clothes, tried to reach under his clothes, and was "hinting things," but Appellant was "like no, no, no."

At that point, Appellant stated his "SARC[20] training" just "kicked in," and it "clicked into [his] head that [he] need[ed] to do something about this." Appellant grabbed his phone and began recording. Appellant explained to AFOSI agents that since JB was "trying to sleep with him" and "trying to get more than just touching," he decided to record the videos with the goal of capturing "what she was trying to go for." When AFOSI agents asked Appellant why he did not continue recording the interaction, Appellant elaborated that he "felt like [they] were clear and concise with what [they] were trying to get at," and that his "goal with the recording was a backup in case she wanted to flip this story around and say something bad about [him] or whatever she [wa]s trying to do." Appellant explained that he had heard cases where "people do something like this because they want to move bases or whatever." Appellant later clarified that although the videos sounded as if he was trying to obtain consent, he wanted to make it "very, very clear" that that was not the intent.

Appellant explained that he did not want to "stop the mission" and told JB she could either stay on her side of the bed or leave. However, Appellant stated that JB "kept pressing on with what she wanted to do," "kept trying to kiss [him] again," and "kept trying to reach [him] again." JB then became upset and left. Appellant stated he did not know how drunk JB was, so he walked her up to her room just to make sure she did not fall or trip over the stairs. Appellant also mentioned he "was pretty drunk [him]self." Appellant told AFOSI he had blacked out and remembered "patches of things" and that "[JB] was passed out so she was pretty drunk as well."

When Appellant was asked if he ever massaged her back he stated "Hmmm…no…no, not that I remember." Later he explained that he rubbed her back to see if she was okay, and SrA TP was in the room and could confirm his account.

After AFOSI agents explained what JB alleged occurred, Appellant was asked if "anything consensual occur[red] that could be said as one way or another." Appellant responded that "[he] d[id]n't remember her taking her bra off or [him] reaching down her pants." However, he did recall JB "trying to get on top of [him]" and that "she probably did get on top of [him] because she was

---

[20] SARC is Sexual Assault Response Coordinator. Appellant seemed to be referring to the yearly training on sexual assault prevention and response (SAPR) that all Airmen receive.

forcing it from the very beginning." Appellant later explained that when he "really, really, th[ought] about it" at one point she was on top of him trying to do things, and he did not know how he might have acted to cause JB to think he was trying to "kiss her or trying to get at her."

One of the agents asked Appellant whether there was any reason his DNA would be found on JB's shirt or underwear. Appellant posited his DNA could be on JB's shirt because he rubbed her back. When asked if his saliva would be found on the front of JB's shirt, he stated he "d[id]n't recall any of that" and "d[id]n't remember" if his mouth was ever on JB's breasts. Appellant was also asked if he was certain that he never touched JB's underwear, he responded that he was "almost positive" that he had not.

## C. JB's AFOSI Interview

During trial JB's AFOSI video-recorded interview from 2 February 2017 was admitted into evidence and portions of it were played in court and transcribed into the record. Due to both Appellant and JB alleging each was the victim of sexual assault by the other, JB was interviewed as both a subject and a victim by a different AFOSI agent than Appellant. JB initially stated Appellant was "feeling around, like rubbing everything." She also told AFOSI that she believed that "he felt her tampon" and then stopped. When the AFOSI agent asked her if Appellant penetrated her JB said, "[A]ll I remember is like he was in there and at first it was like just right at the top [that] he was rubbing;" "[a]nd then he went down further and I think he went to go in and he like felt the string or something and stopped." At that point the AFOSI agent informed JB that he was sorry he had to ask but it "makes it more egregious if he penetrated." At this AFOSI interview, JB never explicitly told AFOSI agents that Appellant penetrated her vagina with his finger.

Later that same day AFOSI agents re-interviewed JB because they needed her to clarify the "really thin line between different assaults" with and without penetration. JB agreed with trial defense counsel that she received "a bit of a lecture on penetration and the vulva;" it was "like a course on penetration that this nice agent was able to give [her];" and "then it wasn't that [Appellant] was going in, he actually went in."

When asked by the military judge why she had not told the agents in her first interview that she had been digitally penetrated, JB explained that she "was just trying to get through it" and "thought it was all the same." JB then agreed with the military judge that "in [her] mind at the time, the fact that he had touched [her] genital area or down in [her] private areas, didn't matter anymore than if he slightly placed his finger in [her] vagina." JB also told the military judge that she did not change her testimony because the AFOSI agent

told her that it was more egregious if Appellant had penetrated her. She explained further that she just wanted to "tell the truth;" she did not know that she "needed to specify penetration;" she thought "it was all the same" and she thought "sexual assault was sexual assault and that there wasn't different levels of it."

JB also told investigators that Appellant asked for a "peck on the cheek" before she could leave the room, instead of a "kiss" as she testified at Appellant's trial. During her testimony JB stated this was incorrect and she must have "misspoke" to the investigators.

## D. Department of Veterans Affairs Claim

In 2018, subsequent to her separating from the military, JB filed a disability claim with the Department of Veterans Affairs (VA). JB learned through a transition assistance course she attended that she was potentially eligible for VA benefits. JB explained that she found out about the claims process a few months after the incident happened and after providing a statement to AFOSI. In her written VA claim JB wrote that "the FCC" put his "fingers" into her vagina. At trial, JB testified that it "must be [a] grammatical error" when she wrote "fingers" versus "finger" in her written VA claim. JB also wrote in her claim that "the FCC" "made [her] fall asleep in his bed." At trial JB denied trying to exaggerate her claim.

## II. DISCUSSION

## A. Legal and Factual Sufficiency

Appellant challenges his conviction for the sexual assault of JB. Appellant contends the evidence is legally and factually insufficient because (1) "the [G]overnment did not prove beyond a reasonable doubt that Appellant penetrated [JB's] vulva with his finger;" (2) "if this [c]ourt is convinced that Appellant penetrated [JB's] vulva with his finger, the [G]overnment did not prove that [JB] did not consent to this penetration;" and (3) "even if this [c]ourt is convinced that [JB] did not consent to penetration, the evidence supported a mistake of fact defense as to consent." We are convinced Appellant's conviction is legally and factually sufficient.

### 1. Law

We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). Circumstantial evidence may suffice. *See United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citing *Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In order to find Appellant guilty of sexual assault as charged here, the Government was required to prove beyond a reasonable doubt that on or about 11 December 2016, at or near Kaiserslautern, Germany: (1) Appellant committed a sexual act upon JB by digitally penetrating her vulva; (2) Appellant did so by causing bodily harm to JB to wit: digitally penetrating her vulva; and (3) Appellant did so with an intent to gratify the sexual desire of JB and Appellant. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(4)(b). "Sexual act" includes the penetration, however slight, of the vulva of another by any part of the body, with an intent to gratify the sexual desire of any person. *MCM*, pt. IV, ¶ 45.a.(g)(1)(B). "'[B]odily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act." *MCM*, pt. IV, ¶ 45.a.(g)(3).

> The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent.

> Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

*MCM*, pt. IV, ¶ 45.a.(g)(8)(A). "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

The defense of mistake of fact as to consent applied if Appellant, because of ignorance or mistake, incorrectly believed that JB consented to the sexual act. *See* R.C.M. 916(j)(1). In order to rely on mistake of fact as to consent as a defense, Appellant's belief must be reasonable under all the circumstances. *See id.*; *see generally United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995)). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see also United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019).

### 2. Analysis

#### a. Penetration

The military judge as the "rational trier of fact" in this case could have found that Appellant digitally penetrated JB's vulva with his finger based on JB's trial testimony. Appellant's own statement to his friend DC that he "fingered" JB buttressed her account. JB's testimony at trial included several explanations of how she knew penetration occurred such as "I just felt his finger go in my vagina."

Appellant contends the Government failed to provide proof of penetration that was "firmly convincing" because JB's statements and testimony were "extremely inconsistent" with regard to whether Appellant penetrated JB's vulva with his finger. Appellant contends JB's testimony was "questionable and not convincing" because in her initial statements to investigators, she did not disclose that Appellant penetrated her vulva with his finger. Appellant notes that JB's initial allegation was that Appellant "rubbed around" her genital area. He asserts it was not until after AFOSI agents told JB it would be a more egregious offense if Appellant penetrated her, and after providing her a "course" on penetration, that JB told investigators that Appellant digitally penetrated her vagina. Appellant posits that this "significant event" should not have been

missing from her initial statement, and therefore her testimony regarding penetration is questionable and not convincing.

However, the military judge could have determined JB's explanation to his questions during trial that she "didn't know [she] needed to specify at that particular moment [during the first interview] that he had penetrated. I thought it was all the same;" and she thought "sexual assault was sexual assault and that there wasn't different levels of it" were reasonable explanations for the original omission.

Appellant next contends that JB's initial failure to mention penetration to investigators, and her testimony that Appellant reached into her pants and put his finger in her vagina "a little bit" without her consent, both demonstrate that penetration may have never occurred. However, in viewing the evidence in the light most favorable to the Prosecution, JB's explanation of why she initially did not disclose penetration was reasonable and "a little bit" met the requirement of penetration "however slight." Appellant's admission to DC that he "fingered" JB would also support a rational factfinder's conclusion that digital penetration, however slight, occurred.

Appellant contends further that JB's VA claim contains other inconsistencies which make her testimony unreliable. However, the military judge could have found that her explanation that "fingers" was a grammatical error reasonable, as was her explanation that she "just slightly" miswrote that Appellant "made her" get into the bed. Even if a rational trier of fact concluded that JB intentionally exaggerated her VA claim, this would not necessarily indicate she falsely reported Appellant had assaulted her, nor would it necessarily negate any element of the offense or provide a defense to Appellant. Rather, the discrepancies could be used as one factor to assess the credibility of JB's trial testimony, which a rational trier of fact could find reliable despite the discrepancies with her later-executed VA claim.

### b. Bodily Harm and Consent

The military judge could have found Appellant's digital penetration of JB was without her consent and therefore constituted bodily harm. JB testified that when Appellant put his hand in her pants, she was "grabbing his arm with both of [her] hands trying to pull his hand out of [her] pants and [she] was grunting and trying to like get out of that position." When specifically asked by trial counsel how she manifested her lack of consent to Appellant digitally penetrating her, JB stated she was pulling on Appellant's arm, grunting, trying to move her head, and trying to "shake everything off" like "his hand off my face and pull his hand out." She further testified she was "extremely scared," "had no idea why it was happening and [she] was just trying to do whatever she could to get out of that situation," and she did not consent.

17

Appellant next contends that JB's "lack of credibility" and the "surrounding circumstances" demonstrate JB consented to the act.

### i) JB's Credibility

Appellant alleges JB's inconsistencies place her credibility in question. Appellant cites whether Appellant asked for a "peck on the cheek" as she told investigators versus a "kiss" as she testified to at trial as one example that places her credibility in question. However, the military judge could have determined otherwise, attributing the discrepancies to any of a number of rational explanations.

Appellant next contends that JB had three motives to lie about whether she did in fact consent to Appellant digitally penetrating her. First, Appellant suggests JB lied to preserve her relationship with SrA BB. Second, Appellant alleges that since JB felt insulted that Appellant took the phone call with DC that it was conceivable that she lied about consenting "in order to get back at Appellant for offending her." Finally, Appellant contends that she had a motive to lie in order to receive benefits from the VA claim. However, the military judge could have found JB's testimony reliable and the alleged motives unpersuasive.

Regarding JB's relationship with SrA BB, JB testified that she spent a lot of time with him, told him she loved him, but that it was also okay if they saw other people. SrA BB also testified that while they were definitely close and had an intimate relationship, they were not dating. Both JB and SrA BB described the nature of their relationship at the time of the offense, in a similar way. The military judge could have reasonably determined that JB was not lying about consent to preserve her relationship with SrA BB.

The second and third motives to lie that Appellant has alleged are similarly unpersuasive. Regarding JB being insulted by the phone call Appellant took from DC, JB testified that "insulted" was not the appropriate word choice but she was "confused." The military judge could have determined JB's feelings about the phone call were unimportant or actually provided further evidence of her lack of consent. Finally, the military judge could have found JB's testimony that she did not even know about the VA claims process until after her statement to investigators reliable. Notably, JB testified that she submitted her claim nearly 10 months after separating from the Air Force and that she understood that she did not need to go through the court-martial process or for Appellant to be convicted to file a claim—further undermining Appellant's contention that her VA claim served as a motive to fabricate.

### ii) Surrounding Circumstances

Appellant posits that JB's conduct before, during, and after the incident support a finding that the act was consensual. Appellant points to JB removing

her bra; cuddling with and kissing Appellant; straddling Appellant and massaging his inner thigh; and only saying "no" when she was told she could remove her pants and when he "attempted" to tickle her. At trial, JB was questioned at length by trial counsel, trial defense counsel, and the military judge about the digital penetration, the surrounding circumstances, and reasoning for the different actions she took that day. The military judge could determine that JB's testimony proved the actions of Appellant were not consensual despite the surrounding circumstances described above.

Appellant also argues the audio recordings are further evidence of consent. Appellant contends that the recordings not only demonstrate proof of consent to the conduct up to that point, but also indicate that JB consented to sexual acts that might follow. However, JB testified that she believed that she was only consenting to the conduct which had occurred up to that point. A person can consent to some sexual contact and not consent to other sexual contact even if the sexual activities follow each other. Even if the military judge believed the recordings reflected JB's consent to later unspecified sexual conduct, the military judge could have found JB's actions while Appellant sucked on her breasts and when Appellant put his hands down her pants clearly indicated her intent to revoke any prior consent.[21]

Appellant next posits an additional argument that the phone call with DC demonstrates consent. This time, Appellant contends JB's failure to ask for help from DC and subsequent failure to leave the room after the call demonstrate consent. However, the military judge could have determined otherwise. When asked why she did not yell for help on the phone, JB explained that "I was very confused at the time. I don't know how to like respond. I was in shock." The military judge could have reasonably concluded that JB was confused and that her decision to not yell for help to an unknown person who called Appellant's phone provided little insight into whether she consented or not to conduct occurring after the phone call ended.

Appellant next contends that JB's behavior after the assault further demonstrates the consensual nature of the digital penetration. Appellant

---

[21] *See United States v. Wilson*, in which while examining the issue of consent to a third act of sexual intercourse in one night after two previous consensual encounters, our sister court stated "it is axiomatic that a woman may revoke consent to sexual intercourse at any time—even after initially consenting to it." No. 201700098, 2018 CCA LEXIS 451, *10 (N.M. Ct. Crim. App. 20 Sep. 2018) (unpub. op). To be clear, we are not addressing the issue of revoking consent after the sexual activity has already begun—those are not the facts of this case—but revoking consent given in advance of the sexual activity. *Cf. United States v. Prather*, 69 M.J. 338, 343 (C.A.A.F. 2011) (stating that consent given before a victim became substantially incapacitated no longer continues to be valid throughout the period of incapacity.).

points to the fact that (1) JB chased Appellant back to his room, willingly entered to retrieve the stuffed bull, and kissed Appellant when he told JB that she could only leave if she gave him a kiss; (2) JB apologized to SrA BB in a text, which Appellant suggests reflected her guilt over consensual activities; and (3) JB went out to a bar later that same evening with the crew. However, JB was questioned at trial about the actions she took following the assault that might be perceived as counterintuitive. For example, JB explained the significance of keeping possession of the stuffed bull during her first overseas mission and testified how, at the time, she did not feel ready to report the sexual assault and was concerned about being sent home prior to completing the mission. She also provided context to her communications with SrA BB, stating in apologizing she was thinking about "how [she had] [got]ten [her]self in that situation and couldn't find a good way to get [her]self out before it had even happened." Thus, the military judge may have found JB's apology to SrA BB a reflection of the complex feelings a person might experience following an unwanted sexual encounter rather than remorse over a consensual sexual activity.

### c. Intent to Gratify Sexual Desires

Although the Appellant never challenges this element on appeal, the military judge could have found that Appellant digitally penetrated JB's vulva with the specific intent to gratify his and JB's sexual desires. The military judge could have relied on JB's testimony that she and Appellant had engaged in consensual kissing, cuddling and massaging up to the point Appellant placed his mouth on her breasts.

### d. Mistake of Fact as to Consent

Appellant next alleges that if this court finds JB did not consent to the penetration then this court should find that Appellant had an "honest and reasonable" belief that JB consented to the sexual act. Appellant contends that the "alleged penetration" happened in the "natural progression" of a sexual encounter and "after Appellant sought and received consent along the way." Appellant highlights the fact he asked for JB's permission to remove the pillow barrier, to cuddle, to kiss, and "he asked [JB] to massage his leg and to remove her bra." Appellant argues he respected JB's wishes when she stated she did not want to remove her pants and wanted him to stop tickling her. Finally, Appellant points out that JB gave "no indication to Appellant that she was not consenting to the sexual acts that led up to the alleged penetration," and she did not verbally tell Appellant that "she did not want him to penetrate her vulva with his finger."

JB testified that she resisted when Appellant began sucking on her breasts. She explained that she began to push against the bed and headboard in an

effort to push herself off Appellant. The military judge could have found that JB's actions of pulling on Appellant's arm, grunting, trying to move her head, and trying to "shake everything off" like "his hand off [her] face and pull his hand out" of her pants were expressions of a lack of consent through conduct at least some of which occurred prior to penetration. Additionally, the military judge could have reasonably determined that Appellant's actions during the assault, such as covering JB's mouth, showed he did not honestly believe JB was consenting. Further, Appellant's statements to AFOSI did not support a mistake of fact defense because Appellant claimed to have no memory of putting his hand down JB's pants. Therefore, it was reasonable for the military judge to determine that Appellant could not have held a reasonably mistaken belief that JB consented to the digital penetration.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of sexual assault of JB beyond a reasonable doubt. *See Barner,* 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner,* 25 M.J. at 325. Therefore, we find Appellant's conviction is both legally and factually sufficient.

## B. Ineffective Assistance of Counsel

Appellant alleges his counsel were ineffective for (1) failing to fully cross-examine a "key witness," DC; and (2) failing to call an expert witness to testify concerning whether a woman who is menstruating "is not necessarily less likely to engage in sexual conduct."[22] Appellant requests we set aside and dismiss the findings and sentence or alternatively order a factfinding hearing pursuant to *United States v. DuBay,* 17 C.M.R. 411, 413 (C.M.A. 1967). With respect to issue (2), we have carefully considered Appellant's contention and find it does not require further discussion or warrant relief. *See United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987).

### 1. Additional Background

During her testimony, JB described the circumstances surrounding the phone call with DC. She explained during direct examination, "There was a

---

[22] Appellant posits that because the trial counsel argued in his closing argument that a woman who was menstruating would never consent to penetration of her vagina, this "unique piece of evidence should have been addressed by an expert witness." Appellant does not claim trial counsel's argument was improper or raise his counsel's failure to object as part of his ineffective assistance of counsel claims. Additionally, Appellant does not attempt to show he was prejudiced by any improper argument that was not objected to at trial. *See United States v. Sewell,* 76 M.J. 14, 18 (C.A.A.F. 2017).

phone call. At this time I can't -- I don't remember if it was before he had sucked on my breasts or after or when exactly it was, but I was straddling him and there was a phone call on his phone and he told me to answer it." Later during cross-examination JB testified that "[a]s soon as he put his mouth on my breasts, that's when I started pushing away because I thought he wanted a hug at that point." Trial defense counsel then asked JB, "So you have now been assaulted, he puts his mouth on your breasts, and you're on top of him and he gets a phone call?" JB responded, "Yes, sir." Moreover, in response to trial defense counsel's question, she agreed she did not say "help" or indicate to DC that she had just been assaulted. JB further testified that she had answered the phone "willingly" and the phone call was "insulting." JB later clarified that she did not "yell for help when [she] was on the phone" because she "was very confused at the time;" she was "in shock;" "it was just all weird to [her]. [She] didn't know how to even explain that." As to her description of the phone call as "insulting" she later clarified she did not use the correct term and the word "confusing" was a more apt description.

On direct examination DC testified that he "vaguely" remembered a female answering the phone when he called Appellant. Trial counsel did not ask any further questions about the telephone call. On cross-examination, Appellant's civilian defense counsel, Mr. TR, asked DC who contacted him first about the case. Mr. TR did not ask any further questions relating to the telephone call.

During closing argument, we note that Mr. TR mentioned ineffective assistance of counsel but it did not concern his cross-examination of DC. Mr. TR said, "[t]housands of pages -- so many pages, Judge, I don't think I still have read them all. I maybe just admitted ineffective assistance of counsel, but just thousands -- seemed to me like the thousands of records and data sheets and cover sheets." After this comment and conclusion of findings argument, the military judge and trial defense counsel had the following exchange:

> [Military Judge (MJ)]: Counsel, I will never go into my deliberative process. I am -- I do attempt to be as thorough as I can to address any issues on the record when I see them to make sure -- to determine whether they are or are not issues. Mr. [TR], I took it in passing for probably what you intended to be with respect to ineffective assistance of counsel. You have been able to properly prepare for this trial, is that correct?
>
> [Mr TR]: Yes, sir.
>
> [MJ]: All right. There was nothing that I observed – [Appellant], are you completely satisfied with your defense counsel?
>
> [Appellant]: Yes, Your Honor.

[MJ]: All right. That's the way I took it. Like I said, I don't leave things sitting in a record. Thank you.

[Mr. TR]: Not a pretty comment, Judge, but just an admission that I just did not get to --

[MJ]: It was not a perception that I had of you as you litigated this case that you were not prepared to defend your client, but –

[Mr. TR]: Pardon, Judge, correct.

[MJ]: -- rather than leaving that in the record, I wanted to make sure. All right.

This court granted Appellant's motion to attach an affidavit to support his claim that his trial defense counsel were ineffective. In his affidavit, Appellant stated that he was "disappointed in [Mr.] TR's extremely limited cross-examination of [DC]." Appellant contends that if Mr. TR had adequately cross-examined DC, he is confident it would have established reasonable doubt regarding the specification of the charge.

Appellant argues that Mr. TR failed to ask DC about the telephone call with JB. He failed to ask DC if JB ever asked him for help or whether she sounded upset. However, Appellant fails to explain in his affidavit what DC would have testified to during cross-examination and elected not to submit an affidavit from DC.

Our court ordered Mr. TR to provide a responsive declaration to Appellant's claim that he was ineffective for failing to adequately cross-examine DC.[23] In his declaration Mr. TR stated "[m]y decision on how to conduct that cross-examination was part of a larger trial strategy that relied on the clear lack of coherent facts in [JB's] testimony." He further detailed this decision by describing his larger trial strategy, and concluding "[m]inimal cross-examination appeared appropriate to me since the Government failed to establish coherent facts." Mr. TR noted the "Government had the burden to investigate and prove this case yet the only independent witness to know anything about the time in question, when [JB] alleged the assault occurred, was [DC]." Mr. TR explained that he provided DC's contact information to the Government because it "corroborated the truth, which was that [JB] enjoyed a sexual tryst with [Appellant] until she realized that he was going out drinking with his friend later that same evening." Mr. TR also said "[DC's] direct and cross-examination was

---

[23] We considered the declarations to resolve this raised issue. *See United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020) (holding Courts of Criminal Appeals may consider affidavits when doing so is necessary for resolving issues raised by materials in the record); *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991).

wholly consistent with the defense case that [Appellant] and JB were having a good time. . . . It would have been ineffective for me, as defense counsel, to pose questions that simply elicited a different answer or a possibly contradictory answer." Mr. TR stated "[a]lmost all of the testimony that defense wished to elicit, the Government did on its direct examination." Also, Mr. TR stated "[t]he fact that during the call JB never asked for help was obvious and did not require questioning by defense counsel." Finally, Mr. TR stated he limited his cross-examination of DC because

> [I]t defied logic that then [Appellant] was in the process of assaulting JB, that he was poised to continue doing so, before the phone call or in any way harmed JB.
>
> My responsibility as the lead defense attorney was to ensure that the Government's case was fully undermined and that the credibility of JB was zero and we believed that we had achieved that goal.
>
> . . . .
>
> At the time of [DC]'s testimony, the credibility of JB was, in my and my client's opinion, in tatters. Neither of us, nor Assistant Defense Counsel, saw value in a detailed exposition of what [DC] remembered since it was two years later and the fact that he had the conversation at all was the paramount fact.

We considered whether a post-trial evidentiary hearing is required to resolve any factual disputes raised by civilian defense counsel's declaration. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. at 413. We find such a hearing unnecessary.

**2. Law**

The Sixth Amendment[24] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

---

[24] U.S. CONST. amend. VI.

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id.* (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Id.* (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted). In reviewing the decisions and actions of trial defense counsel, we do not second-guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474–75 (C.A.A.F. 2005).

**3. Analysis**

We disagree with Appellant that Mr. TR was ineffective for not questioning DC more about the telephone call. Appellant has not overcome the presumption of competence of his counsel.

We find there is a reasonable explanation for Mr. TR's tactical choice to limit the cross-examination of DC along with the trial defense team's strategic decision to focus the case on the credibility of JB. These decisions were not unreasonable and do not represent one of "those limited circumstances" that can provide a foundation for a finding of ineffective assistance. *See Davis*, 60 M.J. at 474.

Even if we assume *arguendo* that Mr. TR was ineffective for not adequately cross-examining DC about the phone call with JB, Appellant has failed to demonstrate a reasonable probability of a different result. *See Gooch*, 69 M.J. at 362. Appellant argues that DC should have been asked questions concerning whether JB "ever asked for help" or "sounded upset." However, that evidence

was already before the military judge. JB herself testified that she never asked for help while on the phone with DC and answered the phone "willingly." Moreover, Appellant has not even attempted to provide us with a declaration from DC indicating what, if anything, DC's testimony would have added to evidence already before the military judge.

### C. Post-Trial Delay

Appellant's case was docketed with this court on 14 June 2019. The delay in rendering this decision after 14 December 2020 is presumptively unreasonable. However, we determine there has been no violation of Appellant's right to due process and a speedy post-trial review and appeal.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay when a Court of Criminal Appeals does not render a decision within 18 months of docketing. *Id.* at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

Concerning prejudice, in *Moreno*, the CAAF identified three types of interests for prompt appeals: (1) prevention of oppressive incarceration; (2) minimizing anxiety and concern; and (3) limitation of the possibility of impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). In this case, we find no oppressive incarceration nor impairment of the Defense at a rehearing because Appellant has not prevailed in his appeal. *See id.* at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has articulated no such particularized anxiety in this case, and we discern none.

Where, as here when Appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We do not find such egregious delays here. Appellant has neither demanded

speedy appellate review nor asserted that he is entitled to relief for appellate delay. Accordingly, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system. *See id.*

Recognizing our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court